**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| LUTHERAN HOME AND SERVICES | ) | Case No. 25-01705 |
| FOR THE AGED, INC., *et al.*, | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | Hon. Michael B. Slade |
| | ) | |

**MEMORANDUM OPINION DENYING**
**MOTIONS FOR RELIEF FROM THE AUTOMATIC STAY**

Four motions to lift the automatic stay are set for hearing on July 23, 2025.  The motions seek relief identical to two prior motions that I denied earlier in these chapter 11 cases:  authority (a) to pursue lawsuits against the Debtors in state court and recover any judgments against insurance proceeds and (b) for the Debtors to satisfy any remaining self-insurance retention ("SIR") under their insurance policy.  I reviewed the motions (Dkt. Nos. 252, 353, 356, 359), the Debtors' omnibus objection (Dkt. No. 387), which the official committee of unsecured creditors ("Creditors' Committee") joined (Dkt. No. 391), as well as the insurance policy documents attached to the Debtors' objection (the "Policy") and conclude that oral argument is unnecessary.

For the reasons set forth below, the motions are denied, without prejudice.  If I granted the relief requested, under the terms of the Policy, the Debtors might be compelled to front the payment of defense costs with only the hope of reimbursement from their carrier for amounts in excess of $125,000 per claim, while being required to manage the defense of the suits.  However, as I explain below, the automatic stay does not bar settlement negotiations and the Debtors and their carrier would be smart to explore settlements where appropriate and—perhaps with the assistance of the Creditors' Committee—begin thinking through how properly preserved tort claims will be liquidated and addressed in the forthcoming plan of reorganization.

1

I.

The Debtors are not-for-profit corporations that own and operate a skilled nursing facility

and retirement communities in Illinois and Indiana.  The Debtors and their advisors are actively

running a marketing process for a sale, financing, or restructuring transaction that is expected to

be proposed for approval this November and yield a plan ripe for confirmation in March of 2026.

(Dkt. No. 335)  Since the petition date, six motions for relief from the automatic stay have come

before me, all by plaintiffs in personal injury or wrongful death suits pending in state court

against the Debtors—and two by the same plaintiff, the administrator of the estate of George

Makris.  I denied the first Makris motion (Dkt. No. 128) and another motion filed by Selma Ellis

(Dkt. No. 225) earlier in these cases for the reasons I articulated during the hearings on March 5,

2025 (*see* Dkt. No. 200, 3/5/25 H'rg Tr. 54-56) and April 2, 2025 (*see* Dkt. No. 412, 4/2/25 H'rg

Tr. 23-28), respectively.  The remaining four motions are still pending:

- **Twohey Motion (Dkt. No. 252):**  Douglas Twohey, executor of the estate of Audrey
Twohey, sued certain Debtors and non-debtors on April 15, 2024 (a year after the alleged
incident, and nine months after Ms. Twohey died) in the Circuit Court of Cook County,
Case No. 2024 L 4094, alleging, among other things, violations of the Illinois Nursing
Home Care Act and negligence.  Other than the suit being pending for nearly a year
prepetition, the motion provides no information as to the status of the litigation or what
amount (if any) of the $125,000 SIR has been used on this claim.  And I have no
information as to the magnitude of the judgment being sought except for the boilerplate
language requesting "in excess of $50,000" at the end of each count of the Complaint
attached to the motion.

- **Makris Motion (Dkt. No. 353):**  Dennis Makris, Administrator of the Estate of George
Makris, sued Debtor Lutheran Home for the Aged, Inc. and two non-debtors on
February 28, 2023 (two years after Mr. Makris died) in the Circuit Court of Cook County,
Case No. 2023 L 4686, alleging violations of the Illinois Nursing Home Care Act and
medical negligence. Other than the suit being pending for two years prepetition, the
motion provides no information as to the status of the litigation or what amount (if any)
of the $125,000 SIR has been used on this claim.  And again I have no information as to
the magnitude of the judgment being sought; the Complaint attached to the motion
includes only the boilerplate language requesting a judgment "in excess of $50,000" at
the end of each count—and only three counts are filed against a Debtor entity.

2

- **Kemnetz Motion (Dkt. No. 356):** Ernest Kemnetz sued two Debtors and a non-debtor affiliate on April 19, 2024 (two years after his injury) in the Circuit Court of Cook County, Case No. 2024 L 4326, alleging violations of the Illinois Nursing Home Care Act and negligence. Other than the suit being pending for nearly a year prepetition, the motion provides no information as to the status of the litigation or what amount (if any) of the $125,000 SIR has been used on this claim. And as before, I have no information as to the magnitude of the judgment being sought; the Complaint attached to the motion uses the same boilerplate language requesting a judgment "in excess of $50,000" at the end of each count—and only two counts are filed against a Debtor entity.

- **Kurjanski Motion (Dkt. No. 359):** Marcella Kurjanski sued Debtor Lutheran Home for the Aged, Inc. on November 12, 2024 (about 14 months after her injury) in the Circuit Court of Cook County, Case No. 2024 L 12706, alleging a violation of the Illinois Nursing Home Care Act. Other than the suit being pending for several months prepetition, the motion provides no information as to the status of the litigation or what amount (if any) of the $125,000 SIR has been used on this claim. Once again I have no information as to the magnitude of judgment being sought, other than the Complaint seeks the boilerplate "in excess of $50,000" for its sole count against the Debtor.

The movants all ask me to lift the stay to permit their lawsuits to proceed so that they can attempt to recover insurance proceeds. But while they each purport to be limiting their recovery to insurance and deny any impact on the estate (*see* Twohey Motion ¶ 12, Makris Motion ¶¶ 8 & 11, Kemnetz Motion ¶¶ 7–8, Kurjanski Motion ¶¶ 7–8) they all include a request to direct or allow the Debtors to pay out of estate assets any unsatisfied portion of the Policy's $125,000 per claim SIR (Twohey Motion ¶ 8, Makris Motion ¶ 6, Kemnetz Motion ¶ 5, Kurjanski Motion ¶ 5). It should be obvious that these requests thus are *not* limited solely to insurance proceeds, and in fact implicate a significant amount of estate property.

II.

I start with basic principles. "The automatic stay is one of the fundamental debtor protections provided by the bankruptcy laws." *In re Benalcazar*, 283 B.R. 514, 521 (Bankr. N.D. Ill. 2002) (quoting H.R. Rep. No. 95–595, at 340 (1977), *as reprinted in* 1978 U.S.C.C.A.N. 5963, 6297); *see also Midlantic Nat. Bank v. New Jersey Dep't of Env't Prot.*, 474 U.S. 494, 503 (1986) (same). "By halting litigation against the debtor, the stay 'gives the debtor a breathing

3

spell from his creditors. It stops all collection efforts, all harassment, and all foreclosure actions. It permits the debtor to attempt a repayment or reorganization plan, or simply to be relieved of the financial pressures that drove him into bankruptcy.'" *Kimbrell v. Brown*, 651 F.3d 752, 755 (7th Cir. 2011) (citing H.R. Rep. No. 95–595, at 340 (1977), *as reprinted in* 1978 U.S.C.C.A.N. 5963, 6296–97); *see In re Prate*, 634 B.R. 72, 76 (Bankr. N.D. Ill. 2021) (the stay "preserves the estate and gives the debtor some respite from creditors").  The stay "serves the debtor's interests by protecting the estate from dismemberment, and it also benefits creditors as a group by preventing individual creditors from pursuing their own interests to the detriment of the others."  *City of Chicago, Illinois v. Fulton*, 592 U.S. 154, 157 (2021).

The stay can be lifted for "cause."  11 U.S.C. § 362(d)(1).  "Cause" is not defined in the Bankruptcy Code.  But the text and context of section 362(d) makes clear that lifting the stay requires a good reason.  The Seventh Circuit has envisioned this as a balancing test where I look to whether lifting the stay would cause harm to the debtor and, if so, whether that harm is outweighed by the harm maintaining the stay would cause the affected creditor.  *See Int'l Bus. Machines v. Fernstrom Storage & Van Co. (In re Fernstrom Storage & Van Co.)*, 938 F.2d 731, 735 (7th Cir. 1991) (using a three-factor test that evaluates whether hardship to the non-debtor caused by maintaining the stay outweighs prejudice to the debtor caused by lifting the stay, and the probability of the creditor prevailing on the merits); *Healthfirst v. Martha Washington Hosp. (In re Martha Washington Hosp.)*, 157 B.R. 392, 395 (N.D. Ill. 1993) ("It is not enough for the creditor to merely show that it will be hurt by the continuation of the stay, rather the creditor must show that neither the debtor nor the other creditors will be injured if the stay is lifted.").  The *Fernstrom* test, though, is just a way of analytically thinking through and documenting a commonsense judgment call—does lifting the stay make practical sense under the

4

circumstances?  *See, e.g.*, *In re Steward*, 668 B.R. 203, 209 (Bankr. N.D. Ill. 2025); *In re Comdisco, Inc.*, 271 B.R. 273, 276 (Bankr. N.D. Ill. 2002) ("It is intuitively obvious that determining whether cause exists to modify the stay to permit a lawsuit to proceed in another court requires a balancing of the costs and benefits of maintaining the stay.").

As I said at the hearings on March 5 and April 2, if there were no burden on the Debtor at all and these were personal injury claims handed over to insurance without any need for the Debtors to take any actions or make any payments, I would seriously consider lifting the stay. Stay relief can be appropriate where "all the plaintiff seeks is a declaration of liability with no monetary consequences for the debtor, as opposed to its insurer." *Fernstrom*, 938 F.2d at 735–36 (concluding that because the judgment sought would serve only as a "predicate" to obtain recovery from the insurance policy, a debtor in that scenario suffers little prejudice); *see also Holtkamp v. Littlefield (In re Holtkamp)*, 669 F.2d 505, 508–09 (7th Cir. 1982) (finding that lifting the stay would not harm the bankruptcy estate because the insurer "assumed full financial responsibility for defending" the suit).  But that is not the case here.

III.

The results of the balancing test here are fairly clear.  On one side of the scale, none of the movants has demonstrated that they will suffer any hardship if the stay remains in place for now.  No claimant has even suggested they are in any specific hurry, let alone identified a reason they would be harmed by waiting eight months to continue their litigation.  And each of these claimants waited a longer period (in each case over a year) to file suit following the respective incidents at issue.  In none of these cases does any claimant allege, for example, that they need to proceed with litigation urgently to preserve testimony or evidence that would otherwise be unavailable, or that they are destitute or on the verge of their own bankruptcies if they do not get

5

to trial imminently, or that given the status of the paused litigation lifting the stay would avoid wasting material already-expended resources.  Those reasons could potentially constitute cause. *Compare Holtkamp*, 669 F.2d at 509 (finding that judicial economy favored permitting a suit to go forward because witnesses, including ones who were out-of-state or physically limited, had already been subpoenaed for a scheduled trial).  But they do not exist here; to the contrary, there is no evidence that any of these four suits need to proceed now.

In stark contrast, the Debtors identified significant prejudice to their estates and to other creditors that would arise if I granted the requested relief.  To be clear, I am not making any findings or decisions regarding the scope and other details of the Debtors' insurance coverage— that hasn't been briefed in much detail and those questions are probably for a different court. But from my review of the Policy, I can readily see several hurdles that the movants would need to overcome before being able to proceed with their suits at this stage of the chapter 11 cases.

The motions all presume that the Debtors have an insurance policy covering their claims and that the carrier will bear the brunt of the stay relief.  But the Debtors have advised me in their objection that the carrier has not accepted the tender of any of these claims, let alone the other claims for which additional lift stay motions would inevitably follow if I granted stay relief for these lawsuits.  Obj. ¶ 3 ("[T]he Debtors' insurer has not assumed responsibility for defending the Debtors with respect to the underlying actions at issue in the Lift Stay Motions, nor has the insurer confirmed coverage with respect to these claims.  To the contrary, since the commencement of the Chapter 11 Cases, the Debtors' insurer has already indicated that they have no duty to assume the defense or settlement of claims and will condition coverage on strict compliance with the terms of the policy."); *see* Policy § VII.A.1 (stating that if the SIR is not satisfied by reason of insolvency of the insured, the carrier has the right *but not the duty* to

assume defense and settlement of any claim); Policy § VII.D (stating carrier has no duty to

assume the charge, defense, investigation, appear or settlement of any claim).[1]  Moreover, the

Policy includes many exceptions to coverage (*e.g.*, Policy §§ VI (Limits of Liability),VIII

(Common Exclusions)), that no party has confirmed are inapplicable to the claims asserted.

So even assuming that these claims are covered by the Policy, I understand (without

making findings) the Debtors' concerns about the potential impact of lifting the stay right now.

Two key mechanics—the $125,000 per claim SIR and the reimbursement (rather than duty-to-

defend or indemnification) nature of the policy—would create significant prejudice to the estate

should multiple tort suits be permitted to proceed in state court during this bankruptcy case.

Precedent coverage litigation tells us that a self-insurance retention often needs to be

exhausted before an insurer's obligations under the policy are triggered.  *See, e.g.*, *T.Y. Lin Int'l v.

Hyundai Marine & Fire Ins. Co.*, No. 97-1693, 1997 WL 703778, at *3 (N.D. Cal. Oct. 27, 1997)

("Where there is a retention in a policy, no duty to defend arises until the insured has

demonstrated that the retention has been exhausted."); *Amatex Corp. v. Aetna Cas. & Sur. Co. (In

re Amatex Corp.)*, 107 B.R. 856, 872 (E.D. Pa. 1989), *aff'd* 908 F.2d 961 (3d Cir. 1990)

(explaining that a self-insured retention "represents the threshold" before an insurer has liability).

The movants clearly understand this as they all ask for authority for the Debtors to satisfy (i.e.,

exhaust) the SIR so that they can access a payout by the insurer (assuming they each win a

sufficiently high judgment in their suits).  Importantly, here, the SIR applies to defense costs and

certain other costs in addition to any judgment awarded.  Therefore, if I required the Debtors to

defend these suits during their bankruptcy cases, the estates could incur administrative claims of

---

[1]  Kemnetz and Kurjanski are under the impression that the insurer is already defending the claims in state court. (Kemnetz Mot. ¶ 9 ("Upon information and belief, Debtors will continue to be defended by its insurance carrier in the Illinois state court litigation."); Kurjanski Mot. ¶ 9 (same))  Neither, though, identifies any "information" that forms the basis for their "belief."

up to $125,000 per case even if the Debtors ultimately prevailed in the litigation.  In that scenario, *only* the Debtors would be paying to defend the claims and the insurance carrier would not shoulder any burden at all.  That is plainly not the situation discussed in *Fernstrom* where seeking a declaration of liability caused no monetary consequences for the debtor.

The Policy is also a claims made, reimbursement policy, not the more common indemnity policy.  *See* Policy § II.A.1.a; *compare Sturgill v. Beach at Mason Ltd. P'ship*, No. 14-cv-0784, 2015 WL 6163787 (S.D. Ohio Oct. 20, 2015) (evaluating insurer's obligations under a typical duty-to-defend policy with SIR) *with Kismet Prods., Inc. v. HCC Benefits Corp. (In re Kismet Prods., Inc.)*, No. 04-25167, 2007 WL 6872750 (Bankr. N.D. Ohio Aug. 28, 2007), *report and recommendation adopted sub nom. Kismet Prods. v. HCC Benefits Corp.*, No. 07-mc-66, 2007 WL 4180654 (N.D. Ohio Nov. 20, 2007) (evaluating insurer's obligation under a reimbursement policy with SIR satisfaction requirements).  The Policy does not define "reimbursement," but the plain meaning of the term and the Debtors' description of the Policy mechanics align—the Policy on its face requires the Debtors to initially lay out the costs associated with defending a claim and satisfying a judgment, with expectation of reimbursement, later, for costs *above* the SIR for each claim.  *See Reimbursement*, BLACK'S LAW DICTIONARY (12th ed. 2024) ("The act or an instance of paying back a sum of money; repayment"); *Reimburse*, Oxford English Dictionary, https://doi.org/10.1093/OED/1006637566 (last visited July 8, 2025) ("To repay (a sum of money which has been spent or lost)."); Obj. ¶ 27 ("[T]he Debtors are first required to fully and finally resolve a claim and pay all costs of defending and resolving such claim — including payment of any settlement or judgement amount.  Only then, upon final resolution of the claim, may the Debtors seek reimbursement from the Insurer for amounts expended in connection with a claim in excess of the SIR amount and up to the per claim limit under the Policy.").

Any costs the Debtors front would be administrative expenses that the Debtors would not be able to compromise in a confirmable plan (absent consent from each claimant)—and even that assumes (rather optimistically) the Debtors wouldn't be required to pay defense costs as they are incurred. Running up these expenditures across multiple lawsuits could push a confirmable plan out of reach for any debtor. And I am not prepared to create that risk for these Debtors, particularly after a protracted fight over the Debtors' cash collateral budget was finally resolved. (*See, e.g.*, Docket Nos. 236, 243) It makes no sense to force the Debtors, their pre-petition lender, and the Creditors' Committee back to the negotiating table to shoehorn hundreds of thousands of dollars in personal injury defense expenses into the cash collateral budget now, especially given that the purpose of any expenditures would be to liquidate contingent prepetition claims that are near the bottom of the absolute priority waterfall.

In the end, if I granted stay relief, it would be the Debtors' assets that are first used to litigate, not the insurer's. After going out of pocket for the cost of litigating each claim, the Debtors would have to pursue reimbursement for amounts over the SIR (potentially through costly coverage litigation) and even if they were successful, they would still be permanently on the hook for the first $500,000 of costs for just these four claims alone. That scenario would see the Debtors "depleting the estate of assets which would otherwise be distributed to creditors with ascertainable, non-contingent claims[,]" a result that "would conflict with the underlying purpose of the bankruptcy stay 'to preserve what remains of the debtor's insolvent estate and to provide a systematic equitable [claims] liquidation procedure for all creditors.'" *Martha Washington Hosp.*, 157 B.R. at 395 (quoting *Holtkamp*, 669 F.2d at 508).

IV.

As I said at the prior lift-stay hearings, under these facts, there is no reason I would allow estate funds to be spent to defend what are contingent, disputed, prepetition unsecured claims in state court at this point in the bankruptcy.  In fact, to justify such payments I likely would have to conclude based on evidence that the Debtors had satisfied the legal standard for payment of a prepetition claim set forth in the Seventh Circuit's decision in *Kmart*—and I don't think that standard could be satisfied in this particular situation.  *See In re Kmart Corp.*, 359 F.3d 866, 873–74 (7th Cir. 2004) (requiring a showing that preferential payment of a prepetition claim will benefit the other, non-preferred creditors).  So it may be reversible error in this Circuit to permit the Debtors to pay the SIR and/or outlay funds for litigation costs on the hope they will successfully obtain reimbursement of the excess spend from their carrier—which is what each of the movants asks me to do.

I also note that if I lifted the stay, it would be the debtors' management team, rather than the insurance carrier, in charge of the day-to-day defense of these claims, *see, e.g.*, Policy § VII.C, which is a distraction they don't need while they attend to a robust marketing process. The automatic stay exists to give a debtor breathing space so that it can reorganize its affairs free of diversions like these.  The Debtors should be focused—and in my view these Debtors are focused—on maximizing value for all stakeholders.  The Debtors should not be forced to make decisions like whether or how to defend prepetition personal injury claims in state court or whether to sue their insurer for coverage at this point in their bankruptcy cases.  The Debtors should remain focused on getting to a plan of reorganization that benefits all stakeholders. That's what the automatic stay is for.

In sum, when applying the balancing test set forth in *Fernstrom*, I don't think the balance is close.  Lifting the stay would likely require the Debtors to spend material sums of estate assets defending prepetition claims, protecting their own coverage position, or both.  In addition, as the Debtors say and the Creditors' Committee seconds, defending numerous state court lawsuits would distract the Debtors from what they should be laser-focused on—maximizing value for all stakeholders.  And on the other side of the scale, whether or not the claims at issue here have merit, there is no evidence that any of these movants has a pressing need to proceed now.

V.

That said, these motions raise an issue that should not be ignored at this point in these chapter 11 cases:  What should ultimately be done to liquidate and treat under the plan properly preserved prepetition tort claims against the Debtors?  The automatic stay merely delays the time such claims must be addressed; it does not eliminate any claims.  *See* 11 U.S.C. §§ 362(c)(2), 524(a), 524(e).  The automatic stay certainly does not bar negotiating settlements of the claims, and I do not know why the insurance carrier would suggest otherwise as Twohey alleges (*see* Twohey Motion ¶ 7).  If a plaintiff wants to negotiate a consensual resolution of their claim and the Debtors and/or carrier are willing to engage, the Bankruptcy Code does not stand in their way and I will consider Rule 9019 motions if any settlements are reached.  In fact, it probably makes sense for the insurance carrier (if it is thinking logically) to start discussing settlements with the claimants now.  The carrier may even get a discount for doing so.

I am not opining here on how the reimbursement nature of the Policy affects the appropriate solution in these cases.  On first review, the Policy does not appear to specify the manner in which the Debtors must satisfy the SIR or the predicate outlay of costs to be reimbursed.  *Compare Kismet*, 2007 WL 6872750, at *5–6, 8–9 (in which a declaratory judgment

as to the insurer's obligations to cover claims against a debtor insured turned on the specific text

of the reimbursement policy and the narrow means by which the self-insured retention could be

considered satisfied).  Rather, the Policy refers to payment of the retention by the insured *or on

the insured's behalf*, *see, e.g.*, Policy §§ VI.G, VII.A, so the door seems open to a mechanism

where the SIR is deemed satisfied if the claimant obtains an allowed general unsecured claim

equal to the remaining SIR for their claim.[2]

Regardless of how the Policy is ultimately interpreted should litigation between the

Debtors (or the claimants) and the insurance carrier be required, the reimbursement feature of the

Policy might make what is typically a challenging discussion between debtors and their carriers

all the more complex.  The Debtors and their insurer would do well to start talking now to work

through the intersection of the Policy terms, Bankruptcy Code, and Illinois state law to determine

how these claims are going to be liquidated and paid, and how to describe that process in the

forthcoming plan of reorganization and disclosure statement.  While I cannot rewrite the Policy,

unlike the court in *Kismet*, I am not convinced that the mere fact the Policy requires the Debtors

---

[2]   *See, e.g.*, Plan of Reorganization, Art. VII.M.2, *In re Cineworld Group plc*, No. 22-90168, (Bankr. S.D. Tex. June 28, 2023), ECF No. 1982, Ex. A (providing that the retention applicable to any claim will be deemed satisfied by the allowance of a general unsecured claim ("GUC") in the amount of the remaining retention; the claimant would receive their pro rata share of the GUC recovery pool for a claim of the SIR amount, rather than the full SIR amount, and the insurance carrier's obligations kicked in only for amounts due above the SIR, consistent with its obligations under the policy); *In re Keck, Mahin & Cate*, 241 B.R. 583, 596 (Bankr. N.D. Ill. 1999) (same).  Post-reorganization settlements in past cases have often followed the same structure.  *See, e.g.*, Stipulation, *In re Cano Health, Inc.*, No. 24-10164 (Bankr. D. Del. Mar. 28, 2025), ECF No. 1557, Ex. A (granting limited relief from plan injunction to prosecute claims and recover against insurance, and providing for claimant to receive a GUC up to the amount of any SIR established upon an award to plaintiffs); Stipulation and Agreed Order, *In re Lois Business Development Corp.*, No. 22-90267 (Bankr. S.D. Tex. Nov. 15, 2024), ECF No. 629 (providing for an allowed general unsecured claim equal to the remaining retention amount, modification of the plan injunction to permit liquidation of the claim in state court and recovery solely against insurance for any judgment in excess of the allowed claim, and waiving any claim for deficiency against the debtors); Stipulation and Agreed Order, *In re Lois Business Development Corp.*, No. 22-90267 (Bankr. S.D. Tex. Aug. 23, 2024), ECF No. 482 (providing for an allowed general unsecured claim equal to the remaining retention amount and an incremental payment by the insurance carrier); Stipulation, *In re Cortland Liquidating LLC*, No. 20-12097 (Bankr. S.D.N.Y. Oct. 25, 2022), ECF No. 1337, Ex. 1 (modifying the automatic stay to permit liquidation of claims and payment from insurance, and including a waiver by the plaintiff of any claim for amounts covered by an SIR or in excess of the policy).

to outlay costs first would tie a court's hands on getting insurance proceeds to claimants who are ultimately determined (whether by a jury or by agreement) to be entitled to them—especially in light of section 524(e) (the discharge injunction does not affect the liability of any other party, including insurers, *see In re Shondel*, 950 F.2d 1301, 1308 (7th Cir. 1991) ("[T]he 'fresh-start' policy is not intended to provide a method by which an insurer can escape its obligations based simply on the financial misfortunes of the insured.")), section 362(c)(2)(C) (the automatic stay terminates in a chapter 11 case upon a discharge determination), and the Illinois Insurance Code, *see Home Ins. Co. of Illinois v. Hooper*, 294 Ill. App. 3d 626, 632 (1998) ("The plain language of section 388 makes clear the legislative intent to prevent insurers from using the insured's bankrupt condition and resulting inability to make actual payment to satisfy a judgment or any portion thereof as grounds to avoid payment on a policy."); *see also In re Allied Prods. Corp.*, 288 B.R. 533, 537 (Bankr. N.D. Ill. 2003) (citing the Illinois Insurance Code and *Hooper*) ("[A]n Illinois statute mandates that insurance policies provide for direct action against the insurance carrier if necessary to collect a judgment against the insured. . . . Thus, under § 388, a claim covered by a liability insurance policy in Illinois, once pursued to judgment against the insured, must be satisfied up to the policy limits—if not by collection against the assets of a solvent insured entity, then against the insurance carrier directly.")).

VI.

Two of the claimants cite Judge Wedoff's comments about Illinois law in *Allied Prods. Corp.* to argue that lifting the stay notwithstanding the SIR would not prejudice the Debtors. *Allied* was an odd situation unrelated to the automatic stay, where the debtor tried a creative and ultimately improper gambit to monetize its insurance policies.  288 B.R. at 536–37.  The Debtor and its insurer, Travellers, were facing many covered environmental claims.  The Debtor sought

13

to sell its insurance policies back to Travellers for $3.5 million, and to use the money to operate its business rather than pay claims covered by the policies. Travellers agreed because the sale would release its coverage obligations for $3.5 million. But Judge Wedoff didn't permit this maneuver, relying on section 363(f) of the Bankruptcy Code and holding that because the claimants had an interest in the policies—which were estate assets—any sale needed to adequately protect the claimants' interest in those policies to be approved. *See id.* at 538.

While *Allied*'s dicta about Illinois law is somewhat germane, it does not justify lifting the stay. The case confirms that the insurer here will not be able to escape its obligations to pay the claimants' claims (whatever those obligations may be) by virtue of the Debtors' chapter 11 filing. *Allied*'s relevance here is to reinforce a key point: that all these motions present is a timing issue about *when* these lawsuits will be litigated (or settled). The insurance money to pay the claimants' claims—to the extent the claims are valid and to the extent there is coverage—will be there later, to the same extent it exists today. With no urgency to the litigation or payment of these claims, and with prosecution of the claims now definitively causing the Debtors to spend time, energy, and (most importantly) estate assets in a way that does not benefit the estate or creditors generally, the balance is clear and lifting the stay is inappropriate.

### VII.

For the reasons described here, the lift stay motions (Dkt. Nos. 252, 353, 356, 359) are denied, without prejudice. I will issue a separate order consistent with this Opinion, making clear that the automatic stay remains in place to delay further litigation of the claims but does not preclude the Debtors or any insurance carrier from having settlement discussions with claimants.

Signed:  July 10, 2025                    By:  _____

MICHAEL B. SLADE
UNITED STATES BANKRUPTCY JUDGE

14