**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| LUTHERAN HOME AND SERVICES | ) | Case No. 25 B 01705 |
| FOR THE AGED, INC., *et al.*, | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | Hon. Michael B. Slade |
| | ) | |

**MEMORANDUM OPINION CONFIRMING FOURTH AMENDED CHAPTER 11 PLAN
AND APPROVING SECOND AMENDED DISCLOSURE STATEMENT**

The Debtors are not-for-profit corporations that own and operate a skilled nursing facility

and retirement communities in Illinois and Indiana.  They seek confirmation of their Fourth

Amended Plan of Reorganization (Dkt. No. 791, the "Plan") and final approval of their Second

Amended Disclosure Statement (Dkt. No. 666, the "Disclosure Statement").  The Plan is

overwhelmingly consensual:  it was originally designed jointly by the Debtors and their

bondholders (*see* Dkt. No. 606 § 3.22) and was amended, prior to solicitation, to incorporate two

settlements, one with their other secured lender, Mission Investment Fund ("MIF") (*see* Dkt. No.

644 § 3.23) and one with the Official Committee of Unsecured Creditors (the "Committee") (*see*

Dkt. No. 658-4 § 3.23).  (*See also* Dkt. Nos. 743, 766)  The Plan was then widely solicited and

unanimously approved by voting creditors.  No economic stakeholder objects to confirmation.[1]

The Plan satisfies each requirement for confirmation under Sections 1123, 1125, and

1129 of the Bankruptcy Code.  So for the reasons stated here, the Plan will be confirmed and the

Disclosure Statement approved.  The remaining objections of the Office of the United States

Trustee (the "UST"), *see* Dkt. No. 718 (the "UST Obj."), are overruled.

---

[1]    One resident filed an objection (Dkt. Nos. 714, 716) to dispute the proposed Cure Cost for the assumption of her
Resident Agreement, in accordance with the deadline in the approved Resident Assumption Notice (*see* Dkt.
No. 663, Ex. 7).  The objection does not oppose confirmation of the Plan.  If the parties are unable to resolve
this dispute, I will hear it and determine the Cure Cost required at a later date convenient for all parties.

1

I.

This is a jointly administered bankruptcy case (*see* Dkt. No. 34) involving eight entities. Debtors Luther Oaks, Inc. ("Luther Oaks"), Pleasant View Luther Home, Inc. ("Pleasant View"), Wittenberg Lutheran Village, Inc. ("Wittenberg"), and Wittenberg Lutheran Village Endowment Corporation ("Wittenberg Endowment") operate as continuing care retirement communities. (DX 1 ¶ 9)[2] Debtors Lutheran Home for the Aged, Inc. ("LHA") and Lutheran Home and Services for the Aged, Inc. ("LHSA") provide assisted living facilities. (*Id.* ¶ 11) Debtor Lutheran Life Communities ("LLC") is a management company that manages each community. (*Id.* ¶ 12) Debtor Lutheran Life Communities Foundation (the "Foundation") raises money to support impoverished residents of the communities and spiritual programming. (*Id.* ¶ 13) The sole corporate member of each of the Debtors other than LHA is non-Debtor Lutheran Life Ministries ("LLM"), a not-for-profit corporation. (*Id.* ¶ 25)

As of October 2, 2025, there were approximately 765 people aged sixty-two and older (the "Residents") living in the Debtors' communities. (DX 6 at 22) Together, the Debtors have provided homes and services to seniors for more than 130 years, with a faith-based mission inclusive of people of all faiths, backgrounds, and traditions. (*Id.* at 22–23)

Luther Oaks, LHSA, LHA, Pleasant View, Wittenberg, and Wittenberg Endowment (the Obligated Group Debtors) are each obligated on the approximately $182 million in bond debt for which UMB Bank is the Master Trustee and Bond Trustee. (DX 1 ¶ 30) The Debtors also have

---

[2] I admitted into evidence, without objection, Debtors' Exhibits 1–40 (Dkt. Nos. 742-1 through 742-40), attachments 1 and 2 to Exhibit 41 (Dkt. No. 738), Exhibit 53–56 (Dkt. No. 745-2, 744-1, 744 pages 6–12, 13–19, and 20–58, and the Amended Declaration of Adam J. Fialkowski (Dkt. No. 770). The Debtors' Witness and Exhibit List is at Docket No. 763. The Debtors' Exhibits are referred in this opinion as "DX __." In addition, I take judicial notice of the docket. *See, e.g.*, *In re Kimball Hill, Inc.* 620 B.R. 894, 901 (Bankr. N.D. Ill. 2020), *aff'd sub nom. Fid. & Deposit Co. of Md. v. TRG Venture II, LLC*, No. 20 C 6105, 2022 WL 952737 (N.D. Ill. Mar. 30, 2022), *aff'd sub nom. In re Kimball Hill, Inc.*, 61 F.4th 529 (7th Cir. 2023).

several secured obligations to MIF, including approximately $4 million drawn on a line of credit and approximately $7 million in additional subordinated debt. (*Id.*)

The Debtors' ability to service their debt obligations and maintain operations was impaired by both the immediate impact of COVID-19 on occupancy rates and the lasting structural changes to the senior care industry incited by the pandemic. (DX 6 at 31–32) As a result, the Obligated Group Debtors defaulted on their secured debts and, in October 2024, the Master Trustee accelerated their bond obligations. (*Id.* at 32–33)

The Debtors were unable to reach a settlement with their lenders so on January 30, 2025, UMB filed suit against them in the District Court. *See UMB Bank N.A. v. Lutheran Life Ministries, et al.,* Civ. Case No. 25-cv-1043, U.S. Dist. Ct., N.D. Ill. That same day, UMB sought the emergency appointment of a receiver over the Obligated Group Debtors and their assets, which was set for hearing on February 4, 2025. (*Id.*, at Dkt. Nos. 3, 5) The Debtors commenced these Chapter 11 cases before that hearing could take place. (Dkt. No. 1)

The year since filing the bankruptcy has been active, involving disputes between the Debtors and their secured creditors, tort claimants, regulators, and general unsecured creditors. Some of the disputes have been heated at times, but the resolution of each has played a substantial role in bringing the cases to an overwhelmingly consensual conclusion that benefits all stakeholders—exactly what Chapter 11 is intended to do.

When these cases began, with all of the Debtors' assets pledged and the communities in the balance, the Debtors filed a motion requesting authority to use their secured debtholders' cash collateral to keep the business alive. (Dkt. No. 19) By agreement, I entered multiple interim orders that allowed the Debtors to utilize cash for operations while they continued negotiations and prepared for a hearing on the non-consensual use of cash collateral if that proved necessary.

3

(*See, e.g.*, Dkt. Nos. 97, 196, 276)  During the litigation process, the Master Trustee raised an objection to the management fee the Obligated Group Debtors paid to LLC using cash collateral, which publicly surfaced the largest dispute between the Debtors and their lenders.  (Dkt. No. 236)  After two months of negotiations, the parties resolved this dispute short of trial by agreeing that the Obligated Group Debtors would cap the management fee at 9% of their revenue.  (Dkt. No. 306)  Since then, the Debtors and their secured lenders have cooperated well to maximize value for the benefit of all stakeholders.

While the Debtors worked to achieve peace with their secured lenders, they were hit with demands that a slew of other pre-petition litigation continue during these bankruptcy cases.  As of the petition date, the Debtors were involved in twenty state court tort actions that were stayed upon the filing of these bankruptcy cases, and twelve plaintiffs in these suits filed proofs of claim prior to the bar date.  In the middle of the cash collateral fight, plaintiffs filed six substantially similar motions seeking relief from stay to pursue state court suits against the Debtors immediately and asking that the Debtors be required to spend over $500,000, if necessary, to satisfy any remaining self-insurance retention under their insurance policy.  (Dkt. Nos. 128, 225, 252, 353, 356, and 359)  I denied the first two motions orally (*see* Dkt. Nos. 173 and 262) and then issued a Memorandum Opinion denying the others when it appeared the requests would continue absent a formal, declarative decision.  (Dkt. Nos. 429, 430)  In my opinion, I advised claimants that they needed to wait and give the Debtors the statutory breathing space provided by the Bankruptcy Code, but that they would not need to wait forever, and the Debtors ought to "begin thinking through how properly preserved tort claims will be liquidated and addressed in the forthcoming plan of reorganization." *In re Lutheran Home & Servs. for the Aged, Inc.*, 670 B.R. 874, 876 (Bankr. N.D. Ill. 2025).

On February 20, 2025, the UST appointed a five-member official committee of unsecured creditors (the "Committee"), which includes three Residents.  (Dkt. No. 135)  Following its appointment and retention of counsel, the Committee undertook a review of the bondholder's liens and security interests.  (DX 6 at 36)  The Committee also investigated any potential claims by and against the Debtors and came to the view that LLC may be liable to the Obligated Group Debtors under Sections 547 and 548 of the Bankruptcy Code due to the prepetition payment of certain management fees and allocations, and that certain members of the Debtors' management team may be liable to LLC or other Debtors due to the prepetition payment of certain incentive compensation.  (Dkt. No. 652 ¶¶ 2, 5–11)  The Committee publicly disclosed these potential claims and used the results of their work (*see id.*) to advocate for the stakeholders that it represents, pressing for a plan that would create a continued and stable business, community, and homes that will continue to enrich the lives of Residents and the largest possible financial recovery for general unsecured creditors.  (*See* Dkt. No. 743)

The Debtors faced other obstacles, too.  After the Petition Date, the Illinois Department of Public Health (the "IDPH") delivered "Emergency" Permit Suspension Notices to Luther Oaks and Pleasant View prohibiting those communities from entering into new contracts with Residents—not because of any issues with their care, but due to their failure to file annual audited financial statements (an act by which the IDPH arguably violated 11 U.S.C. § 525(a)).  On May 19, 2025, Debtors Luther Oaks and Pleasant View filed an adversary complaint against the IDPH seeking injunctive relief for violation of the automatic stay (Adv. Proceeding No. 25-00164, Dkt. No. 1).  The Debtors were able to resolve this dispute without a contested hearing, and the parties filed a joint stipulation with the Court, pursuant to which the adversary proceeding was dismissed without prejudice. (*Id.* at Dkt. Nos. 8, 10)

With all of this behind them and a negotiated deal with their bondholders (which had eluded them previously, leading to these Chapter 11 proceedings), the Debtors filed their first Disclosure Statement and Chapter 11 Plan of Reorganization in November 2025 (*see* Dkt. Nos. 605, 606).  The UST raised objections to it.  (Dkt. Nos. 610, 625)  After addressing many of them and reaching a settlement with MIF, the Debtors filed an Amended Disclosure Statement and Amended Plan on January 7, 2026. (Dkt. Nos. 643, 644)  The UST and the Committee objected to the amended documents (Dkt. Nos. 649, 652), but the Committee's objection ultimately led to an all-day meeting that produced a further settlement—this one between the Debtors, lenders, and the Committee.  (Dkt. Nos. 658, 659)  I granted the Debtors' motion for conditional approval of the Disclosure Statement and authorized the Debtors to solicit votes on the Plan on January 14, 2026.  (Dkt. No. 663)

As the discussion above suggests, the issues that led to these cases and otherwise faced these Debtors were aired publicly in this Court by the Debtors' active stakeholders:  disputes about the operations of the communities, the Debtors' use of cash, payments to management, regulatory disputes, and disputes related to various personal injury tort claims.  And, reflecting the settlements, the creditors who voted on the Plan overwhelmingly voted to accept, with all seven voting classes accepting and every voting creditor unanimously voting "yes" on the Plan.  The Debtors now seek final approval of the Disclosure Statement and confirmation of the Plan.

II.

The Plan implements settlements between the Debtors, their secured lenders, and the Committee.  Through complex, integrated terms and related agreements, the Plan addresses the Debtors' distressed capital structure while preserving the Debtors' business.  Key terms include:

6

a)  Refinancing approximately $180 million of bond debt, with a 4-year moratorium on principal payments, and payment in full in cash of outstanding interest and fees (though impaired, bondholders are projected to realize 100% of the value of their claims);

b)  Refinancing the approximately $4 million line of credit with MIF (though impaired, MIF is projected to realize 100% of the value of this claim);

c)  Satisfying approximately $8.5 million of secured debt owed to MIF (after giving effect to its waiver of accrued interest and fee claims (*see* Disclosure Statement § 7.1(a)), MIF is projected to receive 100% of the value of its claims);

d)  Cash distributions with an estimated value of 30%-41% on general unsecured claims, funded by proceeds from retained causes of action, any remainder in the cure cost reserve account, and the $1.4 million cash settlement payment brokered by the Committee;

e)  Payment in full of general unsecured claims at the Non-Obligated Group Debtors;

f)  Relief from the Plan injunction so that personal injury tort claimants may pursue available insurance in sole satisfaction of their claims;[3]

g)  The assumption and cure of all residency agreements and payment in full of Resident Refund Obligations from the escrow account set up at the beginning of these cases;

h)  Mutual releases of claims against certain parties associated with the Debtors, the lenders, the Committee, and certain creditors that belong to the Debtors (*i.e.*, the Estate Releases) and to consenting creditors (*i.e.*, the Third-Party Releases); and

i)  Exculpation of the Debtors, certain parties associated with the Debtors' funded debt, the Committee, and certain parties related thereto.

The Plan also incorporates a series of agreements (Plan Art. XI.B) to ensure it is adequately administered, including an agreement governing the Creditor Trust (DX 22), documents governing the new bonds (DX 30) and MIF line of credit (DX 23, 32), a list of assumed executory contracts (DX 54), a schedule of officers and directors for the Reorganized Debtors (DX 26), and documentation of a property sale that will occur pursuant to the Plan (DX 56).

---

[3]  The Debtors separately filed a proposed settlement with their insurance carrier to make $2 million available to tort claimants whose claims might be covered by the Debtors' insurance policy (Dkt. No. 708).  Several tort claimants objected to the proposed settlement (*see* Dkt. Nos. 723, 724, 725, 730, 731) but not the Plan, and when the claimants indicated a willingness to accept the treatment detailed in the Plan, the Debtors withdrew their insurance settlement motion.  (Dkt. No. 797, 2/25 Hr'g Tr. 169–70)  No tort claimant objected to the Plan.

The only objecting party, the UST, raises objections to a Plan provision deeming substantive consolidation of the Debtors' Estates for certain administrative purposes and to the Plan's exculpation, release, injunction, and gatekeeper provisions.

Article III.A of the Plan, titled "Deemed Substantive Consolidation," provides that the Plan serves as a motion seeking deemed substantive consolidation of the eight Debtors' Estates into two estates—one for the six entities that are obligors under the prepetition bonds and one for the two entities that are not obligors—for "certain limited purposes," namely soliciting votes and calculating and making distributions under the Plan.  (Plan, Art. III.A)  This provision does not purport to ignore the corporate separateness of the Debtors or Reorganized Debtors for any other purpose.  The UST objects to this provision, arguing that substantive consolidation is an extraordinary remedy that could hypothetically harm innocent creditors and contending that it does not appear to be necessary here as the existing corporate structure will remain intact post-emergence.  (UST Obj. ¶¶ 4–10)

The Exculpation clause of the Plan (Art. VIII.D) addresses hypothetical claims for postpetition acts or omissions that occurred before me—those claims related to the creation, confirmation, implementation, and consummation of the Plan, the Chapter 11 filing, the administration of the Chapter 11 cases, and the restructuring (the "Exculpated Acts")—against the following (the "Exculpated Parties"):

- the Debtors
- the Master Trustee and the Bond Trustee
- the Supporting Holders (as defined in the Plan Support Agreement ("PSA") at DX 4)
- Old National Bank
- MIF
- the Committee
- for each foregoing Entity, that party's affiliates, officers, directors, principals, members, partners, managers, employees, attorneys, advisors, accountants, investment bankers, consultants, representatives, and other professionals solely to the extent that such parties served in those roles during the Chapter 11 cases

Pursuant to this provision, no claim related to Exculpated Acts exists against any Exculpated Party unless the claimant can demonstrate gross negligence or willful misconduct. The UST argues that this provision is impermissible because it is broader than the exculpation granted by 11 U.S.C. § 1125(e) (which makes clear that parties who facilitate a plan that provides new securities cannot be sued for doing so). (*See* UST Obj. ¶¶ 87–94)

The Estate Releases (Plan, Art. VIII.E) provide for the Estates to release certain parties from certain claims related to the Debtors that arose prior to the effective date, as follows:

| Released Parties | *Certain* Claims Related to… |
|---|---|
| • the Debtors / Reorganized Debtors<br>• the Master Trustee and Bond Trustee<br>• Old National Bank<br>• the Supporting Holders (as defined in the PSA)<br>• MIF<br>• the Committee and its members,<br>• the Releasing Parties<br>• for each foregoing party, that Entity's "Related Parties" | • the Debtors and their operations and management<br>• the Chapter 11 cases and financing thereof<br>• bond restructuring<br>• transfer of any debt, security, right or interest of the Debtors'<br>• any claim or interest treated in the plan, the events giving rise thereto, or the restructuring thereof<br>• business relationships between the Debtors and Released Parties<br>• the negotiation, creation, implementation, and consummation of the plan and related agreements |

The Debtors are *not* releasing claims for illegal conduct, gross negligence, bad faith or fraud, and are also expressly preserving the Retained Causes of Action, which (along with the Debtors' defenses and counterclaims to general unsecured claims against the Obligated Group Debtors) are being contributed to the General Unsecured Trust. The Retained Causes of Action are generally described in Exhibit E to the Plan Supplement (DX 24) as any and all causes of action held by the Obligated Group Debtors that are not expressly released or exculpated in the Plan. These include avoidance actions (*e.g.*, those arising under 11 U.S.C. §§ 510, 542–550, and 553), claims for failure to pay for products or services provided by the Debtors, claims to recover receivables arising from the Debtors' businesses (including tax refunds), any tort or professional malpractice claims the Debtors might hold, and any claims arising under their insurance policies.

9

The UST claims these Estate Releases are overbroad because the Released Parties are not limited to those with an "identity of interest" with the Debtors and because it includes unnamed Released Parties, making it, in the UST's view, "unclear and unknown who is being released." (UST Obj. ¶¶ 14–21)

The Third-Party Releases (Plan, Art. VIII.F) are set forth in full below, but generally provide for the Releasing Parties to release the Released Parties from certain claims, as follows:

| Releasing Parties | Released Parties | *Certain* Claims Related to… |
|---|---|---|
| <ul><li>the Debtors / Reorganized Debtors</li><li>the Master Trustee and Bond Trustee</li><li>Old National Bank</li><li>the Supporting Holders (as defined in the PSA)</li><li>MIF</li><li>the Committee and its members</li><li>Claimholders that voted to accept the Plan</li><li>Unimpaired Claimholders who did not opt out</li><li>for each foregoing party, that Entity's Related Parties to the extent the Releasing Party can legally bind them</li></ul> | <ul><li>the Debtors / Reorganized Debtors</li><li>the Master and Bond Trustee</li><li>Old National Bank</li><li>the Supporting Holders (as defined in the PSA)</li><li>MIF</li><li>the Committee and its members</li><li>any Releasing Party not already captured</li><li>for each foregoing party, that Entity's Related Parties</li></ul> | <ul><li>the Debtors and their operations and management</li><li>the Chapter 11 cases and financing thereof</li><li>bond restructuring</li><li>transfer of any debt, security, asset or interest of the Debtors'</li><li>any claim or interest treated in the plan and the events giving rise thereto</li><li>business relationships between the Debtors and Released Parties</li><li>restructuring or liquidation of claims and interests prior to or in the Chapter 11 cases</li><li>negotiation, implementation, and consummation of the plan and related agreements</li></ul> |

Notably, the Third-Party Releases specifically *exclude* (a) claims for illegal conduct, gross negligence, bad faith, or fraud, and (b) any claim to which the Debtor would not be a required party under Fed. R. Civ. Pro. 19 (or its state equivalent) if it were brought.  (Plan, Art. VII(F))[4]

---

[4]   In response to the UST's Objection, the Debtors made a key concession, removing from the definition of Releasing Parties holders who were entitled to vote but abstained.  (*See* Dkt. No. 740, Debtors' Mem. in Support of Confirmation (the "Mem."), ¶ 94 n. 115)  In addition, during the hearing on February 25, 2026, the Debtors also agreed to remove from the definition of Releasing Parties (a) creditors who voted "no" on the plan but didn't check the "opt-out" box; and (b) creditors who are deemed to reject.  (*See* 2/25 Hr'g Tr. at 109–111)  The removal of those parties from the definition of Releasing Parties materially narrows the Third-Party Releases and eliminates the need for me to decide the issues that would be presented by binding these parties.

Third-party releases sound very broad in concept, but as a practical matter usually affect a limited set of claims (if any) that actually exist given that derivative claims belong to the estate. The only category of claims I can think of that *may* be covered are claims Residents might have directly against Debtor employees related to their work for the Debtors (in those cases where the Debtors would be necessary parties). Other theoretical claims are likely illusory; for example, a non-participating bondholder might think it has a claim against the Debtors' officers or directors for operating the Debtors in a way that didn't allow satisfaction of the bonds, but that wouldn't be a direct claim a holder could bring (it's owned by the Estate).[5] Or a bondholder might think it has a claim against the Master Trustee or Bond Trustee for failing to negotiate a refinancing out of court, but that type of claim is almost certainly barred by the bond documents and may not be covered by the Third-Party Releases in any event. I struggle to even conceive of a claim that a party unimpaired by the Plan might have against a Released Party that would be captured by the Third-Party Releases. No one has identified one. So the universe of claims at issue here is likely quite small, and thinking about any claims (or the lack of such claims) concretely rather than abstractly is helpful in assessing whether the Third-Party Releases are appropriate.

In addition, all creditors other than those who affirmatively voted *for* the Plan were given the opportunity to opt out of the Third-Party Releases. As described in more detail below, the Third-Party Releases and creditors' ability to opt out of them were conspicuously disclosed in the Plan, Disclosure Statement, ballot, and the notice of confirmation hearing. That said, the UST argues that the Third-Party Releases are a non-consensual release barred by the Supreme Court's decision in *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204 (2024). (UST Obj. ¶¶ 26–81)

---

[5] "The estate includes any action a debtor corporation may have 'to recover damages for fiduciary misconduct, mismanagement or neglect of duty,' and the trustee succeeds to the right to bring such actions." *In re Teknek, LLC*, 563 F.3d 639, 646 (7th Cir. 2009) (quoting *Koch Refining v. Farmers U. Cent. Exch., Inc.*, 831 F.2d 1339, 1343–44 (7th Cir. 1987)).

Finally, the Plan also includes an Injunction that has the function of implementing the Exculpation, the Estate Releases, and the Third-Party Releases, and a so-called "Gatekeeper" provision that would require parties seeking to bring claims that may be impacted by those provisions to me as an initial matter (Plan, Art. VIII.C).  The UST claims that I lack authority to enter these sorts of provisions.  (UST Obj. ¶¶ 78–86)

III.

The UST's objection does not challenge compliance with the Section 1123, 1125, or 1129 standards applicable here—all but Section 1129(a)(1) are essentially conceded.  But the Debtors must demonstrate compliance with each by a preponderance of the evidence.  To meet their burden, the Debtors offered documents into evidence and called three witnesses to testify at the confirmation hearing: Stretto's Adam Fialkowski, financial advisor Michael Wyse, and LLC CEO M. Sloan Bentley.  All three testified credibly.  I credit, and rely upon, each witness's testimony in finding the Disclosure Statement adequate and in confirming the Plan.[6]  No evidence was offered in opposition to confirmation.

The Plan and Plan Supplement materials demonstrate compliance with Section 1123.  Claim classification and treatment are designated and detailed.  (*See* Plan, Arts. II, III, V)  Similarly situated claims within the same class are receiving the same treatment.  (Plan, Art. III)  The Plan Supplement materials (DX 4, 21–27, 29–34, 53–56) demonstrate adequate means for implementation, which is also discussed in detail in the Plan (*see* Plan, Art. IV).  The Plan itself satisfies Section 1123(a)(6) and (7), and Section 1123(a)(8) isn't applicable as the Debtors aren't individuals.

---

[6]  References to the hearing testimony (available at Dkt. No. 797) are to "2/25 Hr'g Tr. __."

Section 1125(b) of the Bankruptcy Code requires debtors to prepare and distribute to voting creditors a disclosure statement containing adequate information for them to vote on acceptance or rejection of the plan. "[I]n determining whether a disclosure statement provides adequate information, the court shall consider the complexity of the case, the benefit of additional information to creditors and other parties in interest, and the cost of providing additional information." 11 U.S.C. § 1125(a)(1). The disclosure statement must provide information with sufficient detail, as far as is reasonably practicable, to permit an "informed judgment" by those parties that will vote on the Plan. *In re St. Margaret's Health - Peru*, 659 B.R. 691, 696 (Bankr. N.D. Ill. 2024). Adequacy is determined on a case-by-case basis under the facts and circumstances and is largely within the discretion of the bankruptcy court. *See, e.g.*, *In re Cajun Elec. Power Co-op., Inc.*, 150 F.3d 503, 518 (5th Cir. 1998); *Computer Task Group, Inc. v. Brotby (In re Brotby)*, 303 B.R. 177, 193 (9th Cir. BAP 2003). Here, a number of modifications were made to the Disclosure Statement prior to solicitation at the request of the UST and at my request, and there is now no dispute that it was adequate to provide voting creditors with the information necessary to cast an informed vote. It is approved on a final basis.

Section 1129(a)(1) of the Bankruptcy Code requires that the Plan comply with the applicable provisions of the Bankruptcy Code. It does. The UST's arguments to the contrary are legal arguments addressed below. Similarly, 11 U.S.C. § 1129(a)(2) requires that the proponents of the Plan comply with the applicable provisions of the Bankruptcy Code. The proponents of the Plan are the Debtors and, for the reasons stated here, they have complied with the Code.

Section 1129(a)(3) of the Bankruptcy Code requires me to find that the Plan was proposed in good faith and not by any means forbidden by law. Here, the UST does not question the Debtors' good faith in proposing the Plan, and I don't think any effort to do so would be

13

credible. As described above, the Plan is the product of extensive negotiations and consensus among the Debtors, the Debtors' secured lenders, and the fiduciary to the Debtors' unsecured creditors. (*See* 2/25 Hr'g Tr. at 75–82; *see also* DX 4, 22) The parties' negotiations were at arms' length, and the deal reached in the Plan was a "global package" for which all of the agreed-upon provisions, including the releases, were "required." (2/25 Hr'g Tr. at 77, 81, 83–84) Ms. Bentley testified to the Debtors' good faith in proposing the plan (*see id.* at 83), and her testimony, which I found extremely credible, was not challenged. And the proof of the pudding is in the eating: every voting creditor voted "yes" and no economic stakeholder objected to anything in the Plan. (*See* DX 40; Dkt. No. 770) Section 1129(a)(3) was satisfied.

Section 1129(a)(4) of the Bankruptcy Code requires any payment made or to be made by the Debtors or Estates for costs and expenses in connection with the cases to be approved as reasonable. The Plan provides that any such payment must be Court-approved before it is made. (*See* Plan, Art.II.B) I won't approve any fees or expenses if I find them unreasonable, and the Plan complies with Section 1129(a)(4).

Section 1129(a)(5) of the Bankruptcy Code requires the Debtors to disclose the identity and affiliations of anyone proposed to serve post-confirmation as a director or officer, as well as the nature of compensation for insiders. The Debtors have done that. (*See* DX 26) And Section 1129(a)(6) isn't applicable as there is no regulatory or rate change at issue here.

Section 1129(a)(7) of the Bankruptcy Code requires the Debtors to show by a preponderance of the evidence that each holder of an impaired claim or interest has either "accepted the plan" or would receive under the Plan property (that as of the effective date) valued at an amount that is not less than the amount such holder would receive or retain if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code on the same date. This is the

14

"best interests" test. And it was satisfied here by the testimony of the Debtors' financial advisor, Michael Wyse. (*See* 2/25 Hr'g Tr. at 47–55; *see also* DX 41 at Exhibit 1) The Debtors' evidence demonstrated that each tranche of creditors would do the same or worse in a hypothetical liquidation: bondholders would see between $73 and $88 million (instead of the projected 100% recovery over time) and general unsecured creditors would receive nothing. (*See* DX 41 at Exhibit 1) Insured tort claimants would be no worse off.

Section 1129(a)(8) of the Bankruptcy Code is effectively satisfied. Other than Class 10, each class of creditors either is unimpaired or accepted the plan. (Plan, Classification of Classes 1, 4, 6, 7B, 9, 11, and Voting Reports, DX 40 and Dkt. No. 770, with respect to voting classes) Class 10 is Intercompany Claims, and while the Plan deems that class to reject because those claims are being discharged without a distribution, the only holders in that class are, by definition, Debtors (who are Plan proponents and thus accept the Plan) and (to the extent they have claims) their affiliates. Class 10's deemed rejection is likely technical, at most.

Section 1129(a)(9) of the Bankruptcy Code is satisfied because the Plan provides administrative and priority claims with payment in in full (Plan, Art. II.A, III.B) or the treatment prescribed by the statute (Plan, Art. II.D).

Section 1129(a)(10) of the Bankruptcy Code is satisfied because there is an accepting impaired class of creditors—indeed all impaired classes that are not deemed to reject (Classes 2, 5, 7A, and 8)— voted in favor of the Plan. (*See* DX 40; Dkt. No. 770)

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation "is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor" unless "such liquidation or reorganization is proposed in the plan." This is known as the "feasibility" requirement. All the Debtors need to prove is that the plan has reasonable prospects

for success.  Their evidence at the confirmation hearing—testimony from financial advisor

Michael Wyse and LLC CEO M. Sloan Bentley—was sufficient.  (*See* 2/25 Hr'g Tr. at 55–60,

69, 77, 93–94)  The Debtors ultimately filed for Chapter 11 protection when they could not

service their bond debt, and to emerge from bankruptcy and have a stable future, their secured

lenders have made real sacrifices: the supporting bondholders agreed to interest-only bond

payments for the next four years and a 29-year amortization schedule on the principal owed, and

MIF agreed to refinance its letter of credit, among other things.  Those sacrifices required, as part

of the package deal of consideration provided by all parties, the remaining provisions of the

proposed Plan.  And the lenders' sacrifices are what makes the Debtors' financial model work

and this Plan feasible.

Section 1129(a)(12) of the Bankruptcy Code is satisfied because the plan provides for

payment of the UST's fees.  (Plan, Art. II.E)  Section 1129(a)(13) isn't applicable as this plan

does not implicate retiree benefits protected by Section 1114 of the Bankruptcy Code.  Section

1129(a)(14) isn't applicable as there are no relevant domestic support obligations.  Section

1129(a)(15) isn't applicable either, as the Debtors are not individuals.  And Section 1129(a)(16)

is satisfied, as the parties have worked to ensure that the property transfers contemplated by the

Plan comply with applicable non-bankruptcy law; no party asserts otherwise.

To the extent Section 1129(b) of the Bankruptcy Code is implicated, it is satisfied.  The

proposed Plan is fair and equitable and does not unfairly discriminate against anyone.  While

Insured Tort Claims are receiving only whatever they can secure (if anything) from the Debtors'

insurance coverage while other general unsecured claims will be paid pro rata from the net

proceeds collected by the Unsecured Creditor Trust, they are classified differently for a rational

and sensible reason:  because they (unlike, for example, counterparties to rejected contracts)

might be able to access recovery from a third-party source.  No tort claimant objected to that different treatment, and the UST has not challenged the differing treatment of tort claimants from other general unsecured creditors—which I find relevant to the question of "consent" to the opt-out release discussed in more detail below.  There is only one plan.  And the Plan does not have a principal purpose of avoiding taxes; in fact, it has no intention of avoiding taxes.  So, in my view, all provisions of 11 U.S.C. §§ 1123, 1125, and 1129 have been satisfied.

IV.

Perhaps the easiest objection to resolve is the UST's discomfort with the "Deemed Substantive Consolidation" provision in Article III.A of the Plan.  The UST is correct that substantive consolidation is an extraordinary remedy intended to promote fairness where a company ignored corporate forms to the detriment of its creditors.  (*See* UST Obj. ¶¶ 5–6 and cases cited therein)  And here we do not have a situation where separateness was so disregarded prepetition that it is impossible to disentangle the assets, liabilities, and obligors on filed claims.  However, the Plan paragraph at issue is clear (and the Debtors confirmed in their Memorandum of Law in Support of Confirmation and at the hearing, *see* Mem. ¶ 133; 2/25 Hr'g Tr. 105–07) that the Debtors are looking for deemed consolidation only for two limited purposes: voting and distributions under the Plan.  As described below, the Debtors' approach makes sense to me under the specific facts of this case and, as the UST's counsel conceded at the hearing, there is no Bankruptcy Code prohibition of it.  (*See* 2/25 Hr'g Tr. 145)

First, a consolidation of each of the Obligated Group Debtors and of the Non-Obligated Group Debtors for solicitation purposes is a modest twist on the often-accepted "per-plan" theory of vote counting (for determining compliance with 11 U.S.C. § 1129(a)(10)) that would, if

17

approved, satisfy the "per-debtor" approach as well.[7]  Rather than having to demonstrate an impaired accepting class at *each* Debtor, the Debtors sought to count votes according to their two debt silos.  The Seventh Circuit hasn't weighed in (to my knowledge) on the "per-plan" vs "per-debtor" split of authority, so I understand the Debtors' instinct to hedge their bets.  But as things turned out, the belt-and-suspenders approach wasn't necessary.  Between the bondholder and MIF classes, every Debtor has an accepting impaired class, and so the usual solicitation-based justification for a consolidation doesn't exist here.  Even if no one in Class 7A, for example, voted at one or more specific Debtor entities, the solicitation results would have satisfied Section 1129(a)(10)'s requirement that there be at least one class of impaired claims accepting the Plan even under the "per-debtor" analysis.

But the Debtors do have a good reason to seek consolidation for distribution purposes—the operation of the General Unsecured Trust.  As the Debtors noted in their Memorandum and at the confirmation hearing (*see* Mem. ¶ 138; 2/25 Hr'g Tr. 105–06), they are seeking to reduce the costs and burden associated with administering the Trust.  This is a fair concern, given that the Trust assets include the Obligated Group Debtors' (a) interests in the Retained Causes of Action and (b) defenses or counterclaims to General Unsecured Claims.  Those interests and rights belong to *specific* Debtor entities, but it would be administratively burdensome to respect the corporate forms as the proceeds or value from those rights and interests are distributed to claimholders.  To do so, the Unsecured Creditor Trustee would effectively have to create six sub-

---

[7]   *Compare JPMCC 2007-C1 Grasslawn Lodging, LLC v. Transwest Resport Properties Inc. (In re Transwest)*, 881 F.3d 724, 729 (9th Cir. 2018) ("The plain language of [1129(a)(10)] supports the 'per plan' approach."); *In re Charter Commc'ns*, 419 B.R. 221, 266 (Bankr. S.D.N.Y. 2009) ("[I]t is appropriate to test compliance with section 1129(a)(10) on a per-plan basis, not . . . on a per-debtor basis."); *In re NESV Ice, LLC*, 661 B.R. 427, 445–46 (Bankr. D. Mass. 2024) (same) *with In re Tribune Co.*, 464 B.R. 126, 180 (Bankr. D. Del. 2011) *on reconsideration in part*, 464 B.R. 208 (Bankr. D. Del. 2011), *aff'd sub nom. In re Trib. Media Co.*, 587 B.R. 606 (D. Del. 2018), *aff'd sub nom. In re Trib. Co.*, 972 F.3d 228 (3d Cir. 2020), and *aff'd in part sub nom. In re Trib. Media Co.*, 587 B.R. 606 (D. Del. 2018), and *aff'd sub nom. In re Trib. Co.*, 972 F.3d 228 (3d Cir. 2020) and its progeny (requiring each debtor to have an impaired accepting class to satisfy § 1129(a)(10)).

18

trusts—one for each Estate—and painstakingly allocate between the sub-trusts not only the

proceeds of the Trust assets as they are realized, but the claims asserted against the various

Obligated Group Debtors as well.  And given how the Debtors operated (with LLC managing all

the facilities as if they were one entity, *see* Mem. ¶ 138; 2/25 Hr'g Tr. 86–87, 101), those

allocations would be cumbersome to determine, and the juice would almost certainly not be

worth the squeeze.[8]  It is apparent that lumping (x) all general unsecured claims against the

Obligated Group Debtors and (y) all assets funded into the Trust, and making distributions based

on a single pro rata calculation, will be the most time- and cost-efficient approach.  No one

offered evidence to the contrary, and no party in interest, nor the UST, objected to this simple

approach to treatment (which affected creditors surely understood).[9]  And this effort at

administrative efficiency is common.  Many, if not most, plans in complex cases offer a

consolidated pot for the satisfaction of general unsecured claims (whether for the entire company

or each corporate silo) without regard to entity-level distinctions, regardless of how the plan

specifically invokes the term "consolidation."[10]

---

[8]    For example, if all six facilities sourced their toilet paper from a single vendor, the Trustee would have to charge
the Trust for her time parsing through the various invoices underpinning the vendor's claim to figure out what
portion is attributable to Luther Oaks, to Wittenberg, or to Pleasant View.  One can readily imagine a better use
of Trust assets.

[9]    This treatment is also appropriate under the best interests test, given that the evidence shows that the Obligated
Group's value breaks below its secured debt (*see* DX 41, Ex. 1; 2/25 Hr'g Tr. 53), and no party has suggested
any Retained Causes of Action would have sufficient value to bring unsecured creditors at a particular entity
into the black.

[10]   *See e.g.*, Plan, Art. III.B and IV.B, *In re Cineworld Group plc*, No. 22-90168 (Bankr. S.D. Tex. June 28, 2023),
Dkt. No. 1982, Ex. A (providing "administrative consolidation" for voting and to facilitate distributions from
the trust benefitting certain general unsecured claims); Plan, Art. I.F and III.B, *In re Caesars Ent. Operating
Co.*, No. 15-01145 (Bankr. N.D. Ill. Jan 17, 2017), Dkt. 6334, Ex. A (providing that the plan "does not provide
for the substantive consolidation of any of the Debtors," even though certain unsecured classes received pro rata
distributions from a common pool, regardless of the entity at which the claims were asserted); Plan (for T-Side
and Shared Services Debtors), Art. III.B, *In re Energy Future Holdings Corp.*, No. 14-10979 (Bankr. D. Del.
Aug. 29, 2016), Dkt. No. 9421, Ex. A (providing for general unsecured claims to receive pro rata distributions
based on corporate silo, rather than entity, and remaining silent on consolidation for such purposes).

I understand the UST's discomfort with the term "substantive consolidation" as it often means something quite significant.  And the UST may not be alone in that discomfort given that courts sometimes refer to the type of approach the Debtors propose here with variations on that nomenclature—"deemed consolidation" or "limited consolidation," for example.[11]  But both the provision at issue and the Plan overall are clear that a sweeping substantive consolidation of entities is not being effectuated here, and are also clear about what is actually occurring, so I do not share the UST's concerns that approving a plan with this provision sets an improper or confusing precedent for future debtors.  The UST's objection on this point is overruled.

V.

The UST next objects to the scope of the Estate Releases in Article VIII.E of the Plan. The UST claims the Estate Releases are impermissibly broad because the Released Parties are not limited to those with an "identity of interest" with the Debtors and because they release unnamed Related Parties, making it "unclear and unknown who is being released."  (UST Obj. ¶¶ 14–21)  But the point of estate releases is less *who* is being released as much as *what* is released. Here, the Debtors release all claims they aren't retaining and haven't already settled—which makes sense; if the Debtors hold any claims of value, the only two appropriate actions are to keep or realize their value.  All that remains then are claims without foreseeable worth that, if not released, the Debtors would likely decline to pursue anyway.  There is no reason for the Debtors to retain such claims; all that does is deny finality to parties already compromised by the cases.

Section 1123(b)(3)(A) of the Bankruptcy Code allows a plan to include "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate." And "[t]he standards for approving settlements under Rule 9019 or as part of a plan are the same."  *In re Woodbridge*

---

[11]   *See In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 618–19 (Bankr. D. Del. 2001) (referring to "deemed consolidation"); *NESV Ice*, 661 B.R. at 446 (referring to "limited consolidation").

*Grp. of Cos.*, 592 B.R. 761, 772 (Bankr. D. Del. 2018). In the Seventh Circuit, that inquiry

considers whether the settlement is in the best interests of the estate. *In re Doctors Hosp. of*

*Hyde Park, Inc.*, 474 F.3d 421, 426 (7th Cir. 2007). "Among the factors the court considers are

the litigation's probability of success, complexity, expense, inconvenience, and delay, 'including

the possibility that disapproving the settlement will cause wasting of assets.'" *Id.* (quoting *In re*

*Am. Reserve Corp.*, 841 F.2d 159, 161 (7th Cir. 1987)).

The Plan is a consensual plan that is the product of substantial consensus between all

parties who have economic interests in the Debtors. The testimony at the confirmation hearing

clearly established that the Estate Releases are an essential, integral part of the global settlement

effectuated by the Plan. (2/25 Hr'g Tr. at 83–84) The core of the UST's opposition to the Estate

Releases is that he believes that the definition of "Related Parties" presents challenges to

meaningfully assessing the appropriateness of the releases. (UST Obj. ¶ 20) But it is clear to me

that approval here is in the best interests of the Estates. The Debtors are releasing all claims

except for those listed in the Schedule of Retained Causes of Action (DX 24), in exchange for the

Released Parties' contributions to and support of the Debtors' restructuring. The benefit of the

bargain to the Estates is clear—finality—and it makes sense that the Released Parties would

want the assurance of a broad release from any claims that could be asserted by the Estates. The

UST doesn't identify any claim he believes the Debtors should be preserving and upending the

Estate Releases would call into question the settlement, necessitating additional negotiations that

would be costly to all parties involved and again draw Debtors' focus away from core operations.

Both the Debtors and the Committee investigated any potential claims that the Estates

might have against Released Parties. (DX 6 at 36–37) And based on that investigation, the Plan

provides that the Debtors retain certain causes of action that the parties believe may have value

21

and lists those types of claims in the Schedule of Retained Causes of Action within the Plan

Supplement. (DX 24) Balancing the likelihood of the Debtors later discovering a meaningful,

unknown claim against an unspecified entity with the economic cost of disturbing the consensual

plan now, it seems clear that this settlement, and along with it the Estate Releases, is in the best

interests of the Debtors' Estates.  Thus I overrule the UST's objection to the Estate Releases.

VI.

A.

The UST's primary argument is that the Plan's Third-Party Releases (the "TPR") are non-

consensual and thus, he contends, the Plan is unconfirmable.  The TPR provide as follows:

**F.   Third Party Releases.**

**EFFECTIVE AS OF THE EFFECTIVE DATE, EACH OF THE
RELEASING PARTIES CONCLUSIVELY, ABSOLUTELY,
UNCONDITIONALLY, IRREVOCABLY, AND FOREVER RELEASES
(AND EACH ENTITY SO RELEASED SHALL BE DEEMED RELEASED
BY THE RELEASING PARTIES) EACH AND ALL OF THE RELEASED
PARTIES, AND THEIR RESPECTIVE PROPERTY FROM ANY AND ALL
CLAIMS, INTERESTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES,
CAUSES OF ACTION, REMEDIES, AND LIABILITIES WHATSOEVER
(OTHER THAN FOR ILLEGAL CONDUCT, GROSS NEGLIGENCE, BAD
FAITH, OR FRAUD), INCLUDING WITH RESPECT TO ANY RIGHTS
OR CLAIMS THAT COULD HAVE BEEN ASSERTED AGAINST ANY OR
ALL OF THE RELEASED PARTIES WITH RESPECT TO ANY
DERIVATIVE CLAIMS, ASSERTED OR ASSERTABLE ON BEHALF OF
THE DEBTOR, OR THE ESTATE, AS APPLICABLE, WHETHER
KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING
OR HEREINAFTER ARISING, IN LAW, EQUITY, OR OTHERWISE,
THAT SUCH ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO
ASSERT (WHETHER INDIVIDUALLY OR COLLECTIVELY), BASED
ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN
WHOLE OR IN PART, THE DEBTORS, THE OPERATIONS AND
MANAGEMENT OF THE COMMUNITIES, THE CHAPTER 11 CASES,
THE BOND RESTRUCTURING, OR TRANSFER OF ANY DEBT,
SECURITY, ASSET, RIGHT, OR INTEREST OF THE DEBTORS, THE
SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS
GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN
THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS
BETWEEN THE DEBTORS AND ANY RELEASED PARTY, THE**

22

**FINANCING OF THE CHAPTER 11 CASES, THE RESTRUCTURING OR ANY ALLEGED RESTRUCTURING OR LIQUIDATION OF CLAIMS AND INTERESTS PRIOR TO OR IN THE CHAPTER 11 CASES, AND THE NEGOTIATION, FORMULATION, OR PREPARATION OF THE PLAN AND ANY OTHER AGREEMENTS OR DOCUMENTS EFFECTUATING THE PLAN, OR RELATED AGREEMENTS, INSTRUMENTS, OR OTHER DOCUMENTS, INCLUDING BUT NOT LIMITED TO PSA AND PLAN TERM SHEET (INCLUDING, FOR THE AVOIDANCE OF DOUBT, PROVIDING ANY LEGAL OPINION REQUESTED BY ANY ENTITY REGARDING ANY TRANSACTION, CONTRACT, INSTRUMENT, DOCUMENT, OR OTHER AGREEMENT CONTEMPLATED BY THE PLAN OR THE RELIANCE BY ANY RELEASED PARTY ON THE PLAN OR THE CONFIRMATION ORDER IN LIEU OF SUCH LEGAL OPINION); PROVIDED, HOWEVER, THAT THE FOREGOING SHALL NOT RELEASE ANY CAUSE OF ACTION, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY, OR OTHERWISE, THAT RELEASING PARTY WOULD HAVE AGAINST A RELEASED PARTY PURSUANT TO WHICH A DEBTOR OR REORGANIZED DEBTOR WOULD NOT BE A REQUIRED PARTY UNDER RULE 19 OF THE FEDERAL RULES OF CIVIL PROCEDURE OR SIMILAR APPLICABLE STATE RULES OR THAT IS NOT RELATED TO, OR IN ANY MANNER ARISES FROM, IN WHOLE OR IN PART, THE DEBTORS, THE OPERATIONS AND MANAGEMENT OF THE COMMUNITIES, THE CHAPTER 11 CASES, THE BOND RESTRUCTURING, OR TRANSFER OF ANY DEBT, SECURITY, ASSET, RIGHT, OR INTEREST OF THE DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN THE DEBTORS AND ANY RELEASED PARTY, THE FINANCING OF THE CHAPTER 11 CASES, THE RESTRUCTURING OR ANY ALLEGED RESTRUCTURING OR LIQUIDATION OF CLAIMS AND INTERESTS PRIOR TO OR IN THE CHAPTER 11 CASES, AND THE NEGOTIATION, FORMULATION, OR PREPARATION OF THE PLAN AND ANY OTHER AGREEMENTS OR DOCUMENTS EFFECTUATING THE PLAN, OR RELATED AGREEMENTS, INSTRUMENTS, OR OTHER DOCUMENTS, INCLUDING BUT NOT LIMITED TO PSA AND PLAN TERM SHEET (INCLUDING, FOR THE AVOIDANCE OF DOUBT, PROVIDING ANY LEGAL OPINION REQUESTED BY ANY ENTITY REGARDING ANY TRANSACTION, CONTRACT, INSTRUMENT, DOCUMENT, OR OTHER AGREEMENT CONTEMPLATED BY THE PLAN OR THE RELIANCE BY ANY RELEASED PARTY ON THE PLAN OR THE CONFIRMATION ORDER IN LIEU OF SUCH LEGAL OPINION).**

**ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY**

23

**RULE 9019, OF THE THIRD PARTY RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED HEREIN, AND, FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE THIRD PARTY RELEASES ARE: (A) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES; (B) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE RELEASING PARTIES; (C) IN THE BEST INTERESTS OF THE DEBTORS, THE ESTATES AND ALL HOLDERS OF CLAIMS AND INTERESTS; (D) FAIR, EQUITABLE AND REASONABLE; (E) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; (F) CONSENSUAL; AND (G) A BAR TO ANY OF THE RELEASING PARTIES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE THIRD PARTY RELEASE.**

**FOR THE AVOIDANCE OF DOUBT, UNLESS A CREDITOR OPTS OUT OF GRANTING THE THIRD PARTY RELEASE FOR THE BENEFIT OF RELEASED PARTIES, SUCH CREDITOR WILL RELEASE AND BE UNABLE TO PURSUE ANY INDIVIDUAL CLAIMS, INCLUDING TORT CLAIMS, SUCH AS PERSONAL INJURY OR WRONGFUL DEATH, AGAINST ONE OR MORE OF THE RELEASED PARTIES, WHICH INCLUDES THE DEBTORS AND THE REORGANIZED DEBTORS.**

(Plan, Art. VIII.F (emphasis in original))

Key capitalized terms are defined at the beginning of the Plan:

1.142 "***Released Parties***" means, collectively, and in each case in its capacity as such: (i) each of the Debtors, (ii) each of the Reorganized Debtors, (iii) the Master Trustee, (iv) the Bond Trustee, (v) ONB, (vi) the Supporting Holders (as defined in the PSA); (vii) MIF, (viii) the Committee, (ix) each member of the Committee, (x) the Releasing Parties, and (xi) each Related Party of each such Entity in clauses (i) through (x); *provided* that, in each case, an Entity shall not be a Released Party if it: (a) elects to opt out of the releases described in ARTICLE VIII.F of the Plan; or (b) timely objects to the releases contained in ARTICLE VIII.F of the Plan and such objection is not resolved before Confirmation.

1.143 "***Releasing Party***" means, collectively, and in each case in its capacity as such: (i) each Debtor, (ii) each of the Reorganized Debtors; (iii) the Master Trustee; (iv) the Bond Trustee; (v) ONB; (vi) MIF; (vii) the Committee; (viii) each member of the Committee; (ix) each of the Supporting Holders (as defined in the PSA), (x) all Holders of Claims that vote to accept the Plan; (xi) all Holders of Claims that are deemed to accept the Plan who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable notice of non-voting status indicating that they opt not to grant the releases provided in the Plan; (xii) [reserved]; (xiii) each Related Party of each Entity in clause (i) through

24

(xii) for which such Entity is legally entitled to bind such Related Party to the releases contained in the Plan under ARTICLE VIII.F.

(Plan, Art. I.A.1.142–1.143 (emphasis in original))

The TPR are prominently described in the Disclosure Statement as follows:

### 3.13 *Will there be releases and exculpation granted to parties in interest as part of the Plan?*

Yes, the Plan proposes to release the Released Parties and to exculpate the Exculpated Parties. The Debtors' releases, third-party releases, and exculpation provisions included in the Plan are an integral part of the Debtors' overall restructuring efforts and were an essential element of the negotiations among the Debtors and parties to the PSA. The Debtors assert that the Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' restructuring through, among other things, efforts to negotiate and implement the Plan, which will maximize and preserve the going-concern value of the Debtors for the benefit of all parties in interest. Indeed, the Released Parties are integral to the facilitation of the transactions contemplated in the Plan and the releases, as proposed, are necessary to provide finality and permit the Debtors to move forward with the operations of their business without the threat of litigation against them. Accordingly, each of the Released Parties and the Exculpated Parties warrants the benefit of the release and exculpation provisions.

Further, the Debtors are not aware of any viable claims or causes of action that could be included in the Debtors' releases, third-party releases and exculpations. The Debtors have not been presented with compelling evidence to support a successful claim that is contemplated to be released under the Plan. It is the Debtors' assertion that the Debtors releases, third-party releases and exculpations are necessary to allow the Debtors to move forward from these Chapter 11 Cases without threatened litigation being a distraction to the Debtors' implementation of their business plan and, importantly, continuing the high level of care and services for the Residents.

The Committee has informed the Debtors that it conducted an investigation and identified colorable actions that would be released pursuant to the Plan, including, for example, actions under sections 547 and 548 of the Bankruptcy Code. Specifically, the Committee's investigation found that LLC may be liable to the Obligated Group Debtors under sections 547 and 548 of the Bankruptcy Code due to the prepetition payment of certain management fees and allocations by the Obligated Group Debtors to LLC, and that certain members of the Debtors' management team may be liable to LLC and/or the Obligated Group Debtors due to the prepetition payment of certain incentive compensation. LLC and the Debtors' management team dispute the merits of such claims and, to the extent such claims do exist, LLC and the Debtors' management team respectively assert that they have valid defenses to such claims.

25

To efficiently and economically resolve the disagreements with the Committee regarding the merits of potential claims against LLC and individual members of the Debtors' management and in further consideration for the releases and exculpations provided under the Plan, the Debtors and the Committee negotiated in good faith regarding the potential claims and appropriate consideration for the proposed releases. Without any admission by any party regarding the claims identified by the Committee, in full and final resolution of such claims and as further consideration for the releases provided for in the Plan, the Obligated Group Debtors and Non-Obligated Group Debtors will contribute cash in the combined amount of $1,400,000 to the Unsecured Creditor Trust for the benefit of Holders of Allowed Class 7A Claims. The Debtors and the Committee believe that these payments are fair and adequate consideration for the releases provided under the Plan.

IMPORTANTLY, THE FOLLOWING PARTIES ARE INCLUDED IN THE DEFINITION OF "RELEASING PARTIES" AND WILL BE DEEMED TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY AND FOREVER, RELEASED AND DISCHARGED ANY AND ALL CAUSES OF ACTION AGAINST THE DEBTORS AND THE RELEASED PARTIES: (I) EACH DEBTOR, (II) EACH OF THE REORGANIZED DEBTORS; (III) THE MASTER TRUSTEE; (IV) THE BOND TRUSTEE; (V) ONB; (VI) MIF; (VII) THE COMMITTEE; (VIII) EACH MEMBER OF THE COMMITTEE; (IX) EACH OF THE SUPPORTING HOLDERS (AS DEFINED IN THE PSA), (X) ALL HOLDERS OF CLAIMS THAT VOTE TO ACCEPT THE PLAN; (XI) ALL HOLDERS OF CLAIMS THAT ARE DEEMED TO ACCEPT THE PLAN WHO DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASES PROVIDED BY THE PLAN BY CHECKING THE BOX ON THE APPLICABLE NOTICE OF NON-VOTING STATUS INDICATING THAT THEY OPT NOT TO GRANT THE RELEASES PROVIDED IN THE PLAN; (XII) EACH RELATED PARTY OF EACH ENTITY IN CLAUSE (I) THROUGH (XII) FOR WHICH SUCH ENTITY IS LEGALLY ENTITLED TO BIND SUCH RELATED PARTY TO THE RELEASES CONTAINED IN THE PLAN UNDER ARTICLE VIII.F.

Based on the foregoing, the Debtors believe that the releases and exculpations in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Seventh Circuit and the United States Supreme Court. Moreover, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions.  The release, exculpation, and injunction provisions that are contained in the Plan are copied in pertinent part below.

(Disclosure Statement § 3.13, emphasis in original (followed by verbatim copies of the Estate

Releases, TPR, discharge, and exculpation provisions in the Plan))

The UST objected at the time of the hearing on preliminary approval of the Disclosure Statement to the way the TPR were described in it and in the Plan, arguing that it violated the Bankruptcy Rules. (*See* Dkt. No. 625 ¶ 7)  To address the UST's Disclosure Statement objection and comply with Bankruptcy Rule 2002(c)(3), the Debtors also added a short description of the TPR to the Confirmation Hearing Notice provided to all creditors:

> **Releases Under the Plan**. The Plan imposes (i) releases and an exculpation of certain categories of claims or acts related to the Debtors and/or the reorganization arising before the Petition Date or the Effective Date (as applicable) in favor of the Debtors and certain non-debtor third parties and (ii) an injunction (a) prohibiting the pursuit of released or exculpated claims and (b) imposing a "gatekeeper" provision requiring any party intending to pursue claims arising during the Chapter 11 Cases that it believes were not released or exculpated to first obtain Bankruptcy Court authorization to do so.  **Article I.A** of the Plan identifies the parties who are affected by and who benefit from the releases and exculpations (definitions of "Exculpated Parties," "Released Parties," and "Releasing Parties"). The terms of the injunction, releases, and exculpation, including the claims affected, are in **Article VIII**.  **These provisions may affect your rights.**  Parties who wish to opt-out from the Third Party Releases may do so by checking the appropriate box on their Opt-Out Form or Ballot. **The foregoing is a summary only; parties will be bound to the terms of these provisions as set forth in the Plan**.

(Dkt. No. 663 at PDF p. 354 (emphasis in original); *see also* Dkt. No. 676 (certificate of service demonstrating that this document was served on all creditors on January 23, 2026))

There is no question that the TPR are prominently displayed in the Disclosure Statement, Plan, and solicitation materials and creditors are told multiple times in multiple places—clearly—(1) what the TPR do; and (2) that unless they vote "yes," they may "opt out" of the TPR simply by checking a box on a form.  The ballots provided to creditors spell this out clearly.  For example, the ballots provided to bondholder creditors provide as follows:

> **Item 3. Optional Release Election.** If you voted to reject the Plan in Item 2 above or if you abstained from voting on the Plan, check this box if you elect <u>not</u> to grant the third-party releases contained in Article VIII.F of the Plan. Election to withhold consent to the third-party releases contained in Article VIII.F of the Plan is at your option. If you submit your Ballot without this box checked, or if you do not submit your Ballot by the Voting Deadline, you will be deemed to consent to

the third-party releases contained in Article VIII.F of the Plan to the fullest extent permitted by applicable law. If you voted to accept the Plan in Item 2 above, (i) you will be deemed to consent to the third-party releases contained in Article VIII.F of the Plan to the fullest extent permitted by applicable law and (ii) if you checked this box, your election not to grant the releases will not be counted.

□ The undersigned elects **not** to grant the third-party releases contained in Article VIII.F of the Plan.

### PLAN RELEASE, EXCULPATION AND INJUNCTION PROVISIONS

If you are entitled to vote on the Plan and you submit a Ballot and do not check the box in Item 3 above, you shall be deemed to have consented to the third-party release provisions set forth in Article VIII.F of the Plan. The Disclosure Statement and the Plan must be referenced for a complete description of the release, injunction, and exculpation. The Plan currently provides: [the Plan's release, exculpation, and injunction provisions are copied verbatim thereafter.]

(Dkt. No. 663, PDF p. 305–06)

The General Ballot provided to all other creditors states:

[Instruction] 4.   If you elect not to grant the releases contained in Article VIII.F of the Plan, check the box in Item 3. If you submit your Ballot without the box in Item 3 checked, you will be deemed to consent to the releases set forth in Article VIII.F of the Plan to the fullest extent permitted by applicable law. If you voted to accept the Plan in Item 2 above, (i) you will be deemed to consent to the releases contained in Article VIII.F of the Plan to the fullest extent permitted by applicable law and (ii) if you checked the box in Item 3, your election not to grant the releases will not be counted. . . .

**Item 3. Optional Release Election.** If you voted to reject the Plan in Item 2 above or if you abstained from voting on the Plan, check this box if you elect not to grant the third-party release contained in Article VIII.F of the Plan. Election to withhold consent to the third-party releases contained in Article VIII.F of the Plan is at your option. If you submit your Ballot without this box checked, or if you do not submit your Ballot by the Voting Deadline, you will be deemed to consent to the third-party releases contained in Article VIII.F of the Plan to the fullest extent permitted by applicable law. If you voted to accept the Plan in Item 2 above, (i) you will be deemed to consent to the third-party releases contained in Article VIII.F of the Plan to the fullest extent permitted by applicable law and (ii) if you checked this box, your election not to grant the third party releases will not be counted.

> □     **By checking this box, you elect to opt OUT of the Third-Party Release**

28

(*Id.*, PDF p. 320, 324–25)  Creditors not entitled to vote were sent a "Notice of Non-Voting Status" with the same instructions and "opt out" option.  (*Id.*, PDF p. 336–37, 342–46)[12]

183 total creditors voted.  (*See* DX 40, Dkt. No. 770)  Twenty-one parties (eleven voters and ten non-voters) "opted-out" of the TPR.  (*Id.* at Exs. A, D)  The most notable opt outs were the holders of Insured Tort claims who, as reflected in my summary of the TPR above, would be the most likely to be affected by the TPR.  Four of those holders submitted votes, all in favor of the plan, and also opted-out of the TPR; the only party who voted "no" on the Plan also opted out.  (Dkt. No. 737, Ex. A)  In addition, two holders of unimpaired unsecured claims at the Non-Obligated Group Debtors and eight residents who don't have Class 7A claims opted out.  These results suggest that creditors understood the need to "opt out" of the TPR if they wanted to preserve a claim covered by it, although some didn't read it closely enough to understand that voting yes to the Plan meant agreeing to *all* of the Plan (which the documents explained *clearly*).

---

[12]   In challenging whether the opt-out structure used here can demonstrate consent, the UST flags that the Notice of Non-Voting Status sent to classes ineligible to vote included a statement that the notice is being sent "for informational purposes only."  The UST believes this language may have interfered with recipients' understanding that they needed to act if they wanted to opt out of the TPR.  (UST Obj. ¶ 63)  But that same prominent statement also clearly refers to "your rights under the Plan," indicating that the Notice conveys important information to the recipient.  Anyone who flips through the Notice would see the very prominent release, exculpation, and injunction provisions and the Opt-Out Form.  In addition, non-voting classes also received the Notice of Confirmation Hearing, which (due to the UST's diligence and prior argument), included the prominent Bankruptcy Rule 2002(c)(3) disclaimer noted above—which is all the notice the Bankruptcy Code and Rules specify on the matter.  (Dkt. No. 663, Ex. 5 at p. 4)  Ultimately, nearly half of the opt outs received were from parties who may not have received a ballot:  two of the twenty-one opt outs were from holders in non-voting classes, and an additional eight were from parties who did not hold classified claims (and received only the Hearing Notice or publication notice).  This suggests that the Hearing Notice on its own, and the collection of documents parties in non-voting classes received, sufficiently informed parties they needed to submit an Opt-Out Form to opt out of the TPR.  And no party has come forward to say they were actually misled by the inclusion of "for informational purposes only."  As Ms. Bentley testified, there were ample opportunities for any confused parties to seek clarification and the Debtors, the Committee, and the Residents' representatives on the Committee did yeoman's work ensuring creditors—and in particular the Residents—were fully aware of the Plan's provisions and their effect.  (2/25 Hr'g Tr. 88–89, 141)  Other than the Residents of Class 9, the non-voting classes contain what are likely to be relatively sophisticated parties (MIF is Class 4, and I expect taxing authorities are in Class 1A and B (Other Priority Claims) and trade vendors are in Class 7B (GUCs against the Non-Obligated Group)).  I doubt any were confused, or even really needed the Notice of Non-Voting Status to inform them of the presence of TPR and the need to opt out of it if they wished not to be bound.

The trial evidence on the releases was credible and undisputed: the Plan's releases are critical, integral, and necessary parts of the package deal reflected in the Plan's collective settlements. (2/25 Hr'g Tr. at 77, 81, 94, 137–39) And the Committee, as fiduciary for all unsecured creditors, confirmed both the importance of the releases to the deal and the reality that the releases are fair to creditors, too. (*Id.* at 136–37)

B.

The UST first suggests that consensual third-party releases aren't permissible parts of Chapter 11 plans pursuant to 11 U.S.C. §§ 1123 and 1129. He cites the Supreme Court's decision in *Purdue,* but the Court's 5-4 majority opinion expressly—and emphatically—left both that question open and existing law on the subject intact. *See Purdue*, 603 U.S. at 226 ("Nothing in what we have said should be construed to call into question *consensual* third-party releases offered in connection with a bankruptcy reorganization plan . . . ." (emphasis in original)); *see also, e.g.*, *In re Azul S.A.*, -- B.R. --, 2026 WL 40912, at *8 (Bankr. S.D.N.Y. Jan. 6, 2026) ("*Purdue* made it clear that *consensual* third-party releases were not the subject of its decision" (emphasis in original)).

So as I suggested at the confirmation hearing, I must disagree with the UST's broader assertion at the threshold for a simple reason: current Seventh Circuit law rejects his position. Indeed, in noting that consensual releases "pose different questions and may rest on different legal grounds than the nonconsensual releases at issue," the Supreme Court majority in *Purdue* affirmatively cited the Seventh Circuit's decision in *Matter of Specialty Equip. Cos.*, 3 F.3d 1043 (7th Cir. 1993), without questioning its holding or reasoning. *Purdue*, 603 U.S. at 226. While reasonable people could interpret certain parts of *Purdue* differently, this part was clear: "nothing" in *Purdue* "should be construed to call into question *consensual* third party releases"

30

like those in *Specialty Equipment.  Id.*  Under that Seventh Circuit case left undisturbed in *Purdue*, so long as third-party releases are consensual, they are permissible parts of Chapter 11 plans.  And even if I questioned the holding or reasoning of *Specialty Equipment* (I don't), I lack authority to defy a Seventh Circuit case the Supreme Court expressly left intact in the very opinion on which the UST relies.

*Specialty Equipment* sustained substantive third-party releases that wiped away viable third party claims.  That debtor sought Chapter 11 protection while a securities fraud class action by bondholders against its lender and professionals was pending, challenging their conduct in "the issuance of [] debentures during a leveraged buyout." 3 F.3d at 1044.  The debtor's plan swapped the debentures for equity in the reorganized company (a classic debt-for-equity swap), and included, among other things, a release of "third parties (including the Senior Lenders, Debtors' management, and underwriters involved in the 1988 leveraged buyout involving the Debtors) from any liability arising out of a relationship with the Debtors."  *Id.* at 1045.  Creditors who "abstained or voted against the Plan" were deemed, under the plan, "not to have granted the Releases."  *Id.*  But one of the class action plaintiffs wanted to continue suing the professional firms that participated in the leveraged buyout, and objected to the third-party release.  The Bankruptcy Court overruled its objection, and the District Court dismissed its appeal as moot following substantial consummation of the plan.  In affirming, the Seventh Circuit found consensual third-party releases in Chapter 11 plans to be consistent with the Bankruptcy Code:

> While a third-party release, like the one in *Union Carbide* releasing a co-debtor from liability, may be unwarranted in some circumstances, a per se rule disfavoring all releases in a reorganization plan would be similarly unwarranted, if not a misreading of the statute.  Accordingly, courts have found releases that are consensual and non-coercive to be in accord with the strictures of the Bankruptcy Code. . . .

> Although these releases in their various forms do pose a rather knotty problem, it is not one that we need to unravel completely inasmuch as the Releases granted in

31

> the Debtors' reorganization are consensual.  According to the terms of the Plan,
> each creditor could choose to grant, or not to grant, the release irrespective of the
> vote of the class of creditors or interest holders of which he or she is a member.
> As a consequence, a creditor who votes to reject the Plan or abstains from voting
> may still pursue any claims against third-party nondebtors.

*Id.* at 1047; *see also id.* at 1049 (finding the general argument that "these sorts of release are

invalid" to be "a proposition too broad for us to embrace").

The only real distinction between the original Plan at issue here and that at issue in

*Specialty Equipment* was the question of creditors who "abstain from voting." *Id.* at 1047.  The

Plan here originally provided that a creditor who doesn't vote is bound to the TPR unless the

creditor affirmatively "opts-out" by checking a box and returning an Opt-Out Form to the

Debtor.  That distinction may be germane to whether or not a particular creditor's release is

"consensual," but it makes no difference on the first issue presented by the UST—whether

consensual third-party releases can be permissible parts of Chapter 11 plans at all.  Still, the

Debtors have now removed from the definition of Released Parties the key distinction between

this case and *Specialty Equipment*.  Like the plan at issue there*,* here, "[a]ccording to the terms of

the Plan, each creditor could choose to grant, or not to grant, the release irrespective of the vote

of the class of creditors or interest holders of which he or she is a member." *Id.* at 1047.[13]

That said, while I believe *Specialty Equipment* is still good law and requires rejecting the

UST's argument, I think the core question posed by the UST's theory is a fair one: do consensual

releases survive *Purdue*'s <u>logic</u> despite the Supreme Court's disclaiming any critique of

---

[13]  Perhaps Section II of the Seventh Circuit's opinion in *Specialty Equipment* could be construed as dicta given
that the court ultimately affirmed the District Court's dismissal of the appeal on mootness grounds. 3 F.3d at
1047.  The UST suggests it is (*see* UST Obj. ¶ 42 n.4), but I don't think so because the merits and mootness
analyses there were intertwined and because, if all the Seventh Circuit intended to do was to affirm dismissal of
the appeal as moot, it would have omitted Section II from its opinion altogether.  Further, the Supreme Court
cited *only* this case for the proposition that the law on consensual releases was left undisturbed by its decision in
*Purdue*, *see* 603 U.S. at 226, so the Supreme Court appears to have viewed Section II as part of the case's
holding rather than dicta.

consensual releases?  While the majority opinion makes clear that "[n]othing in what we have said should be construed to call into question *consensual* third party releases offered in connection with a bankruptcy reorganization plan," *Purdue*, 603 U.S. at 226 (emphasis in original), it's impossible not to read the 5-4 majority's analysis of 11 U.S.C. § 1123(b)(6) without at least asking that question.  The dissent characterizes the *Purdue* majority's interpretation of Section 1123(b)(6) as "breezy", *compare id.* at 221 n.4 *with id.* at 259 (Kavanaugh, J., dissenting), and while I wouldn't go that far, the majority opinion does seem to create some questions about the scope of Section 1123(a)(6) even as it answers others.

To make sense of the way *Purdue* reads Section 1123(a)(6), I start with its predecessor, *U.S. v. Energy Resources Co.*, 495 U.S. 545 (1990).  That case concerned a plan's treatment of trust fund taxes jointly owned by the debtor and statutory "responsible persons"—a classic debt for which discharge "does not affect the liability of any other entity on, or the property of any other entity for, such debt."  11 U.S.C. § 524(e).  The debtor owed the IRS for both "trust fund" taxes and other taxes, but its plan proposed to force the IRS to treat payments made thereunder toward trust fund taxes—stopping prosecution of the debtor's officers who were separately and independently liable for the debt.  As then-Circuit Judge Breyer described when writing for the First Circuit, this protected non-debtor third parties to the detriment of the creditor IRS.  *See In re Energy Res. Co., Inc.*, 871 F.2d 223, 225 (1st Cir. 1989) (Breyer, J.) ("This order of payment helps the 'responsible' individuals associated with the corporation, for it diminishes the likelihood that they will end up having *personally* to pay the 'trust fund' tax debts that the corporation owes.  That fact also means that the government may find it harder to collect the *entire* tax debt (trust fund and non-trust fund).  If, for example, the reorganized corporation were to run out of money a few years from now and 'trust fund' debts were still owed, the government

33

might collect them from 'responsible' individuals.  But, if all 'trust fund' debts have been paid, and if the only debts are for, say, ordinary corporate income taxes, the government will be out of luck, for there are no *personal* guarantors of payment of a corporation's ordinary tax liabilities.") (emphasis in original).

The question presented in *Energy Resources* was whether the bankruptcy court "has the legal authority" as part of a plan of reorganization to "order the government to apply the tax payments made by the reorganized corporation to the corporation's 'trust fund' debts first."  *Id.* at 226.  The bankruptcy courts and First Circuit answered the question "yes," relying on Section 105 of the Bankruptcy Code and bankruptcy courts' "broad equitable powers."  *Id.* at 226–27, 230.  Notably, neither the two bankruptcy judges at the trial level, nor the First Circuit on appeal, cited or mentioned Section 1123 of the Bankruptcy Code in their opinions at all.[14]

But in affirming, the Supreme Court invoked a separate and independent provision of the Code to implement Section 105—and it was the provision now called 11 U.S.C. § 1123(b)(6).[15] As the Court described in a short, near-unanimous opinion,

> [t]he Bankruptcy Code does not explicitly authorize the bankruptcy courts to approve reorganization plans designating tax payments as either trust fund or nontrust fund.  The Code, however, grants the bankruptcy courts residual authority to approve reorganization plans including "any . . . appropriate provision not inconsistent with the applicable provisions of this title."

---

[14]   The IRS had argued it had a "statutory responsibility to collect all taxes from taxpayers who may be liable," *In re Energy Resources Co., Inc.*, 59 B.R. 702, 706 (Bankr. D. Mass. 1986).  "If it had its druthers, IRS would apply payments first to the non-trust fund taxes due . . . to preserve the personal liability" of non-debtor third parties for those taxes.  *In re Newport Offshore, Ltd.*, 75 B.R. 919, 920–21 (Bankr. D.R.I. 1987).  Bankruptcy judges confirmed these two plans over the IRS's objection, and the First Circuit consolidated the appeals and decided them together in *Energy Resources*, 871 F.2d at 226.

[15]   At the time this was Section 1123(b)(5).  It became Section 1123(b)(6) when a new provision (now § 1123(b)(5)) called the "anti-modification" clause was added as part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA") preventing an individual debtor from modifying the rights of a lender whose claim was secured by the debtor's so-called "principal residence."

*Energy Resources*, 495 U.S. at 549 (quoting what is now 11 U.S.C. § 1123(b)(6)). The Court didn't articulate the scope of the "residual authority" it found in what is now Section 1123(b)(6), but it did invoke that provision as the basis for permitting a plan provision that protected third parties jointly obligated on a debt from a third party creditor's claims and collection rights.

Enter *Purdue*. The Supreme Court majority there found non-consensual third-party releases outside the authority bankruptcy courts are granted in Section 1123(b)(6), but it did so without overturning—indeed, it did so while affirmatively reinforcing—*Energy Resources*. *Purdue*, 603 U.S. at 218 (citing *Energy Resources* for the proposition that Section 1123(b)(6) is a "catchall" provision which, "[d]oubtless". . . "operates to confer additional authorities on a bankruptcy court" beyond that in Sections 1123(a)(1)-(5)). And the majority opinion, while responding directly to many of the strong four-justice dissent's critiques, ignored the dissent's assertion that the *Purdue* majority had found improper a plan provision the Court had explicitly sanctioned in *Energy Resources*. *Compare Purdue*, 603 U.S. at 219–20 & nn. 3–6 *with id.* at 265-66 (Kavanaugh, J, dissenting) (noting that *Energy Recourses* found that the "catchall authority in § 1123(b)(6)" meant "that plan provisions under § 1123(b)(6) can reach non-debtors" and asserting that the majority's "statement that § 1123(b)(6) reaches only '*the debtor*—its rights and responsibilities . . . is factually incorrect several times over'")).[16]

---

[16]   There's a lot of nuance in *Energy Resources* that the *Purdue* dissent doesn't fully grapple with. The plan in *Energy Resources* didn't *directly* release any of the IRS's claims over its objection. It essentially operated like a preliminary injunction—it told the IRS that the debtor's tax payments must first be credited against trust fund tax obligations, meaning that any collection efforts against "responsible parties" (*e.g.*, officers and directors) would have to wait to see if those obligations were ultimately paid by the debtor post-confirmation. The *Energy Resources* plan would, though, have operated to release the IRS's claims to non-trust fund taxes without its consent in a future scenario where the debtor paid enough post-confirmation to cover trust fund taxes but not other taxes, then liquidated; in that scenario, any trust fund taxes lingering from the first bankruptcy would have been paid in full but the non-trust fund taxes would be left unsatisfied (and the IRS left with no party to pursue). Judge Rosenthal's opinion in *Container Store* suggests that *Energy Resources* is best read to approve the plan because the hypothetical scenario where it would effectively result in a non-consensual release was unlikely. 2026 WL 395898, at *10. I'm not sure about that—the opinion lacks the information necessary to assess that probability. But I agree with her conclusion that *Energy Resources*'s survival is inconsistent with reading *Purdue* to prohibit all plan provisions that modify third parties' rights against each other.

35

Stepping back, the plain language Congress used in 11 U.S.C. § 1123(b)(6) appears on its face to permit a plan to contain any provision, so long as it isn't inconsistent with the Bankruptcy Code and so long as the judge deems it appropriate. But the *Purdue* majority didn't read it that way, rejecting what it characterized as the "broadest possible construction" of the provision and expressly saying that (b)(6) does *not* mean "everything not expressly prohibited is permitted." *Id.* at 218. The opinion tells us that (b)(6) confers "additional authorities" on a bankruptcy court separate and apart from those within (b)(1)–(5) and rejects the nonconsensual third-party release because it is "radically different" from what is in (b)(1)–(5), which allow adjusting claims without consent only to the extent such claims "concern the debtor." *Id.* at 218–19. The opinion otherwise tells us little about what (b)(6) authorizes, and only a little more about what (b)(6) doesn't authorize; it's more descriptive than the few words on the topic in *Energy Resources* but falls short of offering a COLLIER-like primer on how to apply Section 1123(b)(6) going forward.

So how does one apply Section 1123(a)(6) to the legal issue present here, consistent with both *Purdue*'s majority opinion *and Energy Resources*? We know that Section 1123(a)(6) is still, as Congress's plain language makes clear, both a "catchall" provision that confers "additional authorities" over and above those in Sections 1123(a)(1)–(5), and a source of "residual authority." We also know that, per *Energy Resources*, a plan can alter the relationship between third parties to the extent that relationship closely relates to the debtor, depending on the facts of the case; that is one of the things Section 1123(a)(6) permits as "appropriate" and not inconsistent with the Bankruptcy Code. *See* 495 U.S. at 549. But per *Purdue,* a plan may not *discharge* a claim of one third party against another party—even where that claim relates to the respective parties' relationships with the debtor—without consent, because impairing parties'

36

rights against non-debtors *without their consent* is something "radically different" than what is otherwise permitted by Sections 1123(b)(1)-(5). *Purdue*, 603 U.S. at 218.

The UST's objection does not go through the exercise required to reconcile the statute with *Energy Resources* and *Purdue*, and different judges can (and have) read the tea leaves from these cases differently. Combined, the conclusion I draw is that *consensual* third-party releases can be, depending on the facts of the case and the scope of the proposed release, permissible parts of Chapter 11 plans. And I am not alone; the uniform consensus of courts so far is that, post-*Purdue* as pre-*Purdue*, consensual third-party releases may be included in Chapter 11 plans. *See, e.g.*, *Epstein v. The Container Store Grp. Inc. (In re The Container Store Grp., Inc.)*, -- B.R. --, 2026 WL 395898, at *10 (S.D. Tex. Feb. 12, 2026) ("Purdue merely prevents a bankruptcy court from relying on § 1126(b)(6) to enter nonconsensual third-party releases and says nothing about a bankruptcy court's authority under this provision to approve other kinds of releases, such as consensual or full-satisfaction releases."); *In re Smallhold, Inc.*, 665 B.R. 704, 717 (Bankr. D. Del. 2024) ("The Court is not aware, however, of any court that has found that a creditor cannot *consensually* release a claim against a third-party under a debtor's plan of reorganization." (emphasis in original)).

The debate over whether third-party releases are valid only if a party specifically "opts in" to them, as opposed to being valid when an "opt-out" structure is utilized, concerns whether a third-party release in a plan is *consensual*—not whether consensual releases are permissible parts of Chapter 11 plans. The Seventh Circuit, as described above, found consensual third-party releases permissible in *Specialty Equipment*. Neither *Purdue*'s holding nor its reasoning undermines *Specialty Equipment*, and nothing in the Bankruptcy Code suggests that enforcing a consensual third-party release as part of a confirmable plan would be outside my authority.

C.

The UST's most detailed objection is that third-party releases that are parts of large, complex Chapter 11 plans aren't "consensual" even where (as here) releasing parties get notice of, and an opportunity to "opt out" of, the releases.  This issue is not free from doubt, and it has split my colleagues across the country.  The question is this: is a release provided by a creditor who gets notice of the opportunity to "opt out" and fails to do so a "consensual" release?

To illustrate the split, let's start in New York.  Most bankruptcy judges there have answered this question "yes" with caveats:  they have found third party "opt-out" releases consensual where: (1) the release and need to "opt out" is "clearly worded and prominently presented in all of the Plan materials, including the ballots and the Opt-Out Form itself," thus being "reasonably calculated to appraise interested parties of their rights in these bankruptcy cases"; (2) "the history of the[] case[] as to the proposed release has been clear and consistent;" (3) "the proposed releasing parties [] have all been promised a full or substantial recovery and have had every incentive to follow the case to see if the promised recoveries come to fruition" and "recoveries are based upon the agreement struck by the Debtors with the Consenting Stakeholders and that agreement is embodied in the Plan, which includes the proposed Third-Party Releases;" and (4) there are indicia the "message to creditors" was "received," such as a material number of opt outs.  *In re Spirit Airlines, Inc.*, 668 B.R. 689, 707–08 (Bankr. S.D.N.Y. 2025) (Lane, J.).[17]  But Judge Wiles found them nonconsensual under the facts of *In re Chassix*

---

[17]  *See also Azul S.A.*, 2026 WL 40912, at *10 (Lane, J.) (same); *In re Avianca Holdings S.A.*, 632 B.R. 124, 136–37 & n.11 (Bankr. S.D.N.Y. 2021) (Glenn, J.) (citing cases) ("[N]umerous cases in this district and elsewhere have approved the use of an opt-out procedure.  I agree with Judge Chapman's analysis in *Cumulus Media*—the opt-out structure is permissible provided that a clear and prominent explanation of the procedure is given as it has been here.  To repeat Judge Chapman's conclusion: 'Inaction is action under appropriate circumstances.  When someone is clearly and squarely told if you fail to act your rights will be affected, that person is then given information that puts them on notice that they need to do something or else. That's not a trap.' Tr. of Hr'g at 27–28, *In re Cumulus Media Inc.*, No. 17-13381 (Bankr. S.D.N.Y. Feb. 1, 2018)"); *In re LATAM Airlines Grp. S.A.*, No. 20-11254, 2022 WL 2206829, at *46 (Bankr. S.D.N.Y. June 18, 2022) (Garrity, J.) ("[C]ourts in this

*Holdings, Inc.*, reasoning that creditors there were unlikely to be paying attention to the details of the plan and that "[c]harging all inactive creditors with full knowledge of the scope and implications of the proposed third party releases, and implying a 'consent' to the third party releases based on the creditors' inaction, is simply not realistic or fair, and would stretch the meaning of 'consent' beyond the breaking point." 533 B.R. 64, 81 (Bankr. S.D.N.Y. 2015). And a District Court judge in New York also rejected the concept of the "opt out" in its entirety in a short opinion late last year, relying on contract law principles. *See In re GOL Linhas Aéreas Inteligentes S.A.*, 675 B.R. 125 (S.D.N.Y. 2025).

My colleagues in Delaware have also split on the same question.[18] The lack of consensus in Delaware is perhaps illustrated best by two excellent opinions by Judge Goldblatt. In the first, *In re Arsenal Intermediate Holdings, LLC*, he approved use of the "opt-out" structure, analogizing it to many other aspects of fundamental bankruptcy practice where creditors are deemed to consent to relief against them by failing to raise a timely objection to a request despite

---

district routinely approve opt out release language in cases in which creditors and interest holders have been provided with 'a clear and prominent explanation of the [opt out] procedure.'" (second alteration in original)), *corrected*, No. 20-11254, 2022 WL 2541298 (Bankr. S.D.N.Y. July 7, 2022), *aff'd sub nom. Ad Hoc Grp. Of Unsecured Claimants v. Latam Airlines Grp. S.A. (In re Latam Airlines Grp., S.A.)*, 643 B.R. 756 (S.D.N.Y. 2022), *and aff'd sub nom. TLA Claimholders Grp. v. LATAM Airlines Grp. (In re LATAM Airlines Grp. S.A.)*, 55 F.4th 377 (2d Cir. 2022); *In re Roman Cath. Diocese of Syracuse, N.Y.*, 667 B.R. 628, 632 (Bankr. N.D.N.Y. 2024) (Kinsella, J.) ("[T]he Court finds the reasoning provided in the *LATAM* and *Avianca* cases persuasive in allowing the opt-out procedure.").

18   In addition to Judge Goldblatt's decisions discussed here, *compare In re Mallinckrodt PLC*, 639 B.R. 837, 879–81 (Bankr. D. Del. 2022) (Dorsey, J.) (approving the opt-out structure to create consensual third-party releases) (citing decisions coming to the same conclusion in *Extraction Oil & Gas* (Sontchi, J.) and *Insys Therapeutics* (Gross, J.)); *In re Boy Scouts of Am. & Del. BSA, LLC*, 642 B.R. 504, 675 (Bankr. D. Del. 2022) (Silverstein, J.) (agreeing with *Mallinckrodt*), *supplemented*, 2022 WL 20541782 (Bankr. D. Del. Sept. 8, 2022), *aff'd*, 650 B.R. 87 (D. Del. 2023), *aff'd in part, rev'd in part, dismissed in part* 137 F.4th 126 (3d Cir. 2025); *and In re Indianapolis Downs, LLC.*, 486 B.R. 286, 306 (Bankr. D. Del. 2013) (Shannon, J.) ("[T]he record reflects [abstaining or rejecting] parties were provided detailed instructions on how to opt out, and had the opportunity to do so by marking their ballots. Under these circumstances, the Third Party Releases may be properly characterized as consensual and will be approved.") *with In re Washington Mut., Inc.*, 442 B.R. 314, 355 (Bankr. D. Del. 2011) (Walrath, J.) ("[T]he Court concludes that the opt out mechanism is not sufficient to support the third party releases anyway, particularly with respect to parties who do not return a ballot."); *and In re Emerge Energy Servs. LP*, No. 19-11563, 2019 WL 7634308, at *18 (Bankr. D. Del. Dec. 5, 2019) (Owens, J.) ("The Court understands that its position [rejecting the opt-out] is a minority amongst the judges of this District.").

notice.  No. 23-10097, 2023 WL 2655592, at *6–7 (Bankr. D. Del. Mar. 27, 2023) ("[T]he term 'consensual' is used in the sense that a confirmation hearing in which no party-in-interest raises an objection is described as a 'consensual' hearing. . . . Perhaps, as a technical matter, it would be more accurate to say that any objections to the third-party release were 'forfeited,' rather than to say that the releases are 'consensual.'  The basic import, however, is the same.").  More recently, in *Smallhold*, Judge Goldblatt reconsidered *Arsenal* and, finding its underpinnings undermined by *Purdue*'s construction of Section 1123(b)(6), came to the opposite conclusion.  665 B.R. at 719–20 (based on the logic of *Purdue*, "it is no longer appropriate to require creditors to object or else be subject to (or be deemed to 'consent' to) such a third-party release").[19]

Moving South, even prior to *Purdue*, nonconsensual third-party releases were prohibited in the Fifth Circuit, and yet the Bankruptcy and District Judges there have consistently approved of the opt-out framework for consensual releases where the facts satisfied criteria similar to that described in *Spirit*.  "Hundreds of chapter 11 cases have been confirmed in th[e Southern] District [of Texas] with consensual third-party releases with an opt out.  And, again, *Purdue* did not change the law in this Circuit."  *In re Robertshaw US Holding Corp.*, 662 B.R. 300, 323 (Bankr. S.D. Tex. 2024) (Lopez, J.) (citing *Cole v. Nabors Corp. Servs., Inc. (In re CJ Holding Co.)*, 597 B.R. 597, 609 (S.D. Tex. 2019)).  *See also In re Pipeline Health Sys., LLC*, No. 22-90291, 2025 WL 686080, at *4 (Bankr. S.D. Tex. Mar. 3, 2025) (Isgur, J.) (holding personal injury plaintiff in contempt of a plan release for continuing to sue debtor hospital's employees after plaintiff did not opt out).  In the most recent Texas case on the issue, *Container Store*,

---

[19]   While Delaware is split, its neighbor New Jersey is not; all bankruptcy judges there have thus far approved the "opt-out" structure.  *See, e.g.*, 11/24/25 Transcript at 57–60, *In re New Rite Aid, LLC*, No. 25-14861 (Bankr. D.N.J. 2025) (Kaplan, J.), Dkt. No. 3409 ("To be clear, this Court's [pre-*Purdue*] position has not changed and joins other courts in this district, the circuit and the 93 other districts which approve the use of informed opt out procedures to reflect consent, to propose consensual releases under the Chapter 11 plan."); 8/15/24 Transcript at 53–54, *In re Sam Ash*, No. 24-14727 (Bankr. D.N.J. Aug. 15, 2024) (Meisel, J.), Dkt. No. 492 (to same effect).

District Judge Rosenthal issued a thorough opinion (with which I largely agree) detailing the "many factors in determining whether the procedures around the opt-outs were sufficient to find consent" and finding them satisfied for most affected creditors.[20]  2026 WL 395898, at *15–18.

There is little on-point precedent closer to home.  While it has decided several related and very relevant cases, the Seventh Circuit hasn't had an opt-out case in the plan confirmation context, and I haven't located any precedent in this district from the last two decades.  In the only on-point published bankruptcy case that I have found from this district, Judge Doyle applied *Specialty Equipment* and concluded that the "opt-out" structure works to create a consensual third-party release.  *In re Conseco, Inc.*, 301 B.R. 525, 528 (Bankr. N.D. Ill. 2003) ("The [third-party] release now binds only those creditors who agreed to be bound, either by voting for the Plan or by choosing not to opt out of the release.  Therefore, the [third-party] release is purely consensual and within the scope of releases that *Specialty Equipment* permits.").

All told, while the jury is still out and there are cases going the other way, a modest majority of judges addressing the question agree that (1) while consensual third-party releases are not necessary and appropriate in every case, they are in some cases; and (2) in those cases where the evidence justifies a consensual third-party release, if care is taken to ensure adequate notice, the "opt-out" framework works to demonstrate consent.  This rationale is consistent, as described below, with *Specialty Equipment* and Seventh Circuit authority on related bankruptcy questions.  It is without question a case-by-case-analysis.  There is no *formula*.  But the factors identified in *Sprit* and *Container Store* are all helpful in evaluating the specific situation at bar:

---

[20]   Essentially the same framework has been adopted by bankruptcy courts confronting the issue of third-party "opt-out" releases in Georgia, where even after *Purdue* they have been approved where they "meet certain procedural requirements" and are justified under the particular circumstances of the case.  *See In re Lavie Care Ctrs., LLC*, No. 24-55507, 2024 WL 4988600, at *16 (Bankr. N.D. Ga. Dec. 5, 2024) (Baisier, J.) (citing *In re Envistacom LLC*, No. 23-52696 (Bankr. N.D. Ga. Nov. 8, 2023) (Cavender, J.)).

a)  whether the release and "opt-out" framework were an important part of an overall deal between the debtor and supporting creditors that generated all or a material part of the creditors' recoveries;

b)  whether creditors are getting sufficiently robust recoveries to suggest that they are paying attention and at least considering a vote;

c)  whether fiduciaries for creditors were substantively involved in the bankruptcy generally, the plan process, or both;

d)  whether the notice of the need to "opt out" or otherwise consent to the release was clear and easy enough to understand in the documentation sent to creditors;

e)  whether the process of "opting out" was simple and accessible;

f)  whether there is substantial support for the plan;

g)  whether there are indicia that the "message to creditors" was "received," such as a material number of opt outs; and

h)  whether other unique circumstances might bear on consent to the release through silence.

D.

I am not persuaded by the UST's argument that silence cannot create consent under the law of this state or circuit.  As a threshold matter, Seventh Circuit precedent in bankruptcy cases is clear—lack of objection *counts as consent* where notice is sufficient and the opportunity to object is clear.  The two key Seventh Circuit cases on this score are *FutureSource LLC v. Reuters Ltd.*, 312 F.3d 281 (7th Cir. 2002) and *Fogel v. Zell*, 221 F.3d 955 (7th Cir. 2000).

Let's start with *FutureSource*.  In the bankruptcy at issue there, Reuters bought assets from a debtor called Bridge, free and clear of all claims, liens, and encumbrances, in an auction pursuant to 11 U.S.C. § 363(f).  FutureSource was a party in interest that got notice of, but did not object to, any of the terms of the sale.  312 F.3d at 284.  FutureSource later sued Reuters and sought a preliminary injunction, seeking to compel it (the buyer) to continue providing the service previously provided to FutureSource by the debtor/seller.  The District Court granted a preliminary injunction, treating Reuters as a successor to Bridge, but the Seventh Circuit

42

reversed, finding that successorship to the agreement at issue wasn't a part of the deal and that

FutureSource had to object to the transaction on the front end to avoid being bound to it:

> It is true that the Bankruptcy Code limits the conditions under which an interest can be extinguished by a bankruptcy sale, but one of those conditions is the consent of the interest holder, and *lack of objection (provided of course there is notice) counts as consent.*

*Id.* at 285 (emphasis added).  While *FutureSource* was a Section 363 case, I see no valid

distinction between silence-as-consent in the Section 363 context—where assets are sold to third

party buyers free and clear of all third party claims every day in bankruptcy—and the Section

1129 context.  I asked the UST's counsel at argument (2/25 Hr'g Tr. at 152–54) if the UST could

offer a principled distinction between the two scenarios; there was no compelling response.  In

this Circuit, silence, assuming notice, is consent.

 *Fogel* suggests the same conclusion.  It involved a Chapter 7 liquidation of a pipe

manufacturer where the Chapter 7 Trustee had filed fraudulent conveyance claims against those

who had allegedly looted the debtor prior to bankruptcy.  221 F.3d at 958–59.  As part of a

settlement agreement in which the alleged looters paid money into the estate, the district court

entered an injunction prohibiting any third party (including the City of Denver) from suing the

alleged looters.  But Denver hadn't received notice of the settlement because it hadn't filed a

timely proof of claim in the bankruptcy.  And it was lack of notice—not any issues with the

court's power to release a third party claim—that doomed the settlement's release of Denver's

claim.  According to the Seventh Circuit, Denver was (as a customer of the debtor) within the

class of known creditors that deserved actual notice; publication notice didn't suffice.  *Id.* at 962–

63.  So Denver couldn't be faulted for failing to participate, or be bound, without notice.

 Yet the Seventh Circuit's analysis in *Fogel* suggests that releases like that in the Plan here

*can be* appropriate in bankruptcy and *can* operate to release third party claims.  It is true that,

43

generally, "two parties cannot agree to extinguish the claim of a third party not in privity with either of them—let alone the potential claims of 10,000 third parties." *Id.* at 964. But that's a generalization. Where there *is* a relationship between a third party and those privy to the settlement, a settlement that impacts a third party's rights is "paradigmatic of bankruptcy" and the court "can enjoin a third party from interfering with the disposition of the property in the debtor's estate, just as an ordinary injunction can be made to run against third parties who have notice of it, in order to prevent interference with it." *Id.* at 964–65 (internal citations omitted). Thus, the Seventh Circuit reasoned, once Denver *was* given notice (which happened while the matter was on appeal), it could "be enjoined from prosecuting in any other forum the claim that it had filed in that proceeding," and if the settlement that barred its claim wasn't satisfactory to Denver, it could (now on notice) object. *Id.* at 966–97. As in *FutureSource,* the key to the court's power to impact third party rights through a bankruptcy in *Fogel* was *notice*—and if a party fails to act despite notice the law doesn't require exempting that party from the result.

The reality is that in bankruptcy, consent is often implied from inaction—"provided of course there is notice," *FutureSource*, 312 F.3d at 285. The Supreme Court has confirmed that consent to a bankruptcy court's jurisdiction is implied unless an objection is raised expressly and timely.[21] Executory contracts are assumed and cure amounts definitively set (even where the amount identified is wrong) where counterparties receive notice and do not object.[22] Indeed, Section 1123(a)(4) of the Bankruptcy Code provides that holders in the same class must get the

---

[21]   *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 683–84 (2015) ("Nothing in the Constitution requires that consent to adjudication by a bankruptcy court be express. Nor does the relevant statute, 28 U.S.C. § 157, mandate express consent; it states only that the bankruptcy court must obtain 'the consent'—consent *simpliciter*—'of all parties to the proceeding' before hearing and determining a non-core claim."); *see also Richer v. Morehead*, 798 F.3d 487, 490 (7th Cir. 2015) (noting that "implied consent is good enough").

[22]   *Cf. ReGen Cap. I, Inc. v. UAL Corp. (In re UAL Corp.)*, 635 F.3d 312, 321 (7th Cir. 2011) (declining to decide whether a confirmed plan violated Section 365 of the Bankruptcy Code because its terms bound the creditor even if it did).

44

same treatment unless a holder agrees to worse treatment; surely they are bound if a debtor

formally proposes a plan with worse treatment for some, gives them actual notice, and they

entirely ignore the proposal.[23]  More generally, our Rules are explicit that relief may be granted

if you are served with a motion and do not respond.  *See* Bankr. N.D. Ill., L.R. 9013-1(F)(2).

While these examples are not identical to the "opt-out" formulation presented in the Plan,

I don't think the distinctions make a difference under our Circuit's precedent.  As the Seventh

Circuit has made clear, interested parties are expected as a matter of law to review the terms of

bankruptcy plans when they are provided notice and to either act or lose their rights:

> Quite the contrary—it is perfectly reasonable to expect interested creditors to
> review the terms of a proposed plan and object if the terms are unacceptable,
> vague, or ambiguous.  As this court said in *In re Pence*, 905 F.2d 1107, 1109 (7th
> Cir. 1990), a creditor is "not entitled to stick its head in the sand and pretend it
> would not lose any rights by not participating in the proceedings." *See also In re
> Andersen*, 179 F.3d 1253, 1257 (10th Cir. 1999) ("A creditor cannot simply sit on
> its rights and expect that the bankruptcy court or trustee will assume the duty of
> protecting its interests."); *In re Szostek*, 886 F.2d 1405, 1414 (3d Cir. 1989)
> (stating that creditors must take an active role in protecting their rights).

*In re Harvey*, 213 F.3d 318, 322 (7th Cir. 2000).

---

[23]  I explored the nature of Section 1123(a)(4) of the Bankruptcy Code with the UST at the confirmation hearing. (*See* 2/25 Hr'g Tr. at 158–60)  I appreciate the UST's candor during that discussion, and find it germane to the issues that remain in dispute.  As I suggested, a debtor might propose different treatment for similarly situated creditors in a Plan and (as they did here) explain in the Plan, Disclosure Statement, and a confirmation hearing why the debtor believed that treatment was appropriate.  In a case with many creditors, making individual signed contracts with all of them impracticable, how does a debtor obtain "agreement" to "less favorable treatment" necessary to comply with Section 1123(a)(4)?  As I suggested and the UST agreed, it does so by proposing a plan and seeing if anyone objects to that treatment.  (*Id.*)  If no one does (and no one did here), affected creditors (even if they didn't vote) are deemed to have "agreed" to the less favorable treatment.  (*Id.*)

I find support for this reading in Congress' (presumed deliberate) choice of words.  Contrast the language of Section 1123(a)(4) ("unless the holder . . . agrees") with that of Section 1129(a)(7), which requires that a creditor do better than they would in a liquidation unless it "has accepted the plan."  Congress appears to contemplate that parties can manifest consent to plan provisions in different ways, depending on the severity of the provision's impact.  To agree to do worse than one would in a liquidation requires a higher consciousness than to only be treated worse than other similar creditors but still receive a better recovery than the creditor would in a liquidation.  Given the scope and practical effect of the TPR, I see no principled distinction between the Section 1123(a)(4) scenario (where you may be asked to give up a little relative to similarly situated creditors and silence equates to consent) and the opt-out framework.  *See also Spirit*, 668 B.R. at 701–02.

Despite this precedent, the UST asserts that the "opt out" cannot work because silence doesn't bind parties to contracts they didn't affirmatively sign or otherwise say "yes" to under state law contract formation principles.  (*See* UST Obj. ¶¶ 30–46)  Some courts have relied on this rationale to reject the opt out, *see, e.g.*, *GOL*, 675 B.R. at 130–31, but I don't see how it can be dispositive.  It is true that plans of reorganization are often thought of as contracts between debtors and their stakeholders.  But confirmed plans still bind all stakeholders who get notice—whether or not they vote or otherwise affirmatively indicate consent, and whether or not the plan complied with the Bankruptcy Code when confirmed.  *See generally* 11 U.S.C. § 1141(a).  The UST's argument that creditors who receive full, complete notice but choose (for whatever reason) not to respond are not bound because they did not "affirmatively accept" the plan as a matter of state contract law is troubling.  If accepted, the UST's theory could undermine all of Chapter 11 by exempting creditors who aren't paying attention, strategically follow proceedings without appearing, or otherwise refuse to affirmatively say yes for some other reason, from the terms of confirmed plans of reorganization.  That is not how bankruptcy works.[24]

The UST's reliance on state contract law is an imperfect fit here for other reasons, too. As Judge Rosenthal notes in *Container Store*, the Restatement "provides that 'silence and inaction operate as an acceptance' when 'the offeror has stated or given the offeree reason to understand that assent may be manifested by silence or inaction, and the offeree in remaining

---

[24]  We learn early in law school that a contract requires offer, acceptance *and consideration*.  *See* Fuller & Eisenberg, BASIC CONTRACT LAW (1996) at 4 (citing *Dougherty v. Salt*, 227 N.Y. 200 (N.Y. 1919) (Cardozo, J.)).  Yet it is not uncommon for equityholders or junior creditors to receive nothing in a plan of reorganization merely because there is insufficient value to flow to them under principles of absolute priority.  Are those stakeholders nonetheless bound to a plan even though they receive no consideration as a matter of basic contract law?  Of course they are.  So state law contract formation principles do not really answer the questions posed by plan confirmation in general or the UST's Objection in particular.  A plan of reorganization is, and is not, a contract—akin to glass, an amorphous solid with liquidlike properties.  A plan is its own creature—an agreement several parties negotiate to implement a statutorily-compliant reorganization, which the bankruptcy court has the power to impose on others.

silent and inactive intends to accept the offer.'" *Container Store*, 2026 WL 395898, at \*17

(quoting RESTATEMENT (SECOND) OF CONTRACTS § 69(1)(b)). As the lead Seventh Circuit case

cited by the UST to apply Restatement § 69 makes clear, "silence means rejection" is a general

rule to which there are exceptions based on the details of the situation. *See First Nat. Bank of*

*Chi. v. Atl. Tele-Network Co.*, 946 F.2d 516, 519 (7th Cir. 1991) ("The law ordinarily treats

silence as rejection, not acceptance, of an offer, if that is how the proposal of a term left open in

the original contract should be viewed. But that is in general, not in every case. If circumstances

make it reasonable (ordinarily on the basis of previous dealings with the offeree) for the offeror

to construe silence as acceptance, he may do so."). And the other Seventh Circuit case cited by

the UST involving Restatement § 69 undercuts his argument. That case involved an employment

relationship between a financial advisor and Morgan Stanley. Their dispute resolution procedure

did not require arbitration but stated that any changes would be "announced in advance" before

binding employee and firm. *Gupta v. Morgan Stanley Smith Barney, LLC*, 934 F.3d 705, 708

(7th Cir. 2019). Morgan Stanley later emailed its employee a new agreement containing an

arbitration obligation, attaching a link to an "opt-out form" in bold capital letters. *Id.* at 708–09.

The employee ignored the email, and the Seventh Circuit found him bound to the new agreement

because his failure to opt out equated to consent. "This case does not present an unsolicited

offer-by-email from a stranger when the expectation of the offeree's response is rare, if not

baseless. Instead, employment includes the understanding that employees will act with diligence

in following an employer's instructions and responding to requests, whether transmitted by email

or another reasonable mode of communication. Here, Gupta submits no evidence, policy, or

prior course of dealings from which we can infer that Gupta was free as an employee to ignore

Morgan Stanley's communications without repercussion." *Id.* at 714.

47

So too here.  This was not, as the UST suggests, just an "unsolicited offer" to a stranger that recipients were free to accept, reject, or ignore without consequence.  It was a proposed plan of reorganization solicited under the Bankruptcy Code, and it is clear as a matter of law in this Circuit that those who receive notice of a proposed plan and ignore it do so at their own peril.  *See, e.g.*, *Harvey*, 213 F.3d at 322; *Pence*, 905 F.2d at 1109.  State contract law cannot change that reality; while I don't need to answer the questions of "does federal or state law control" or "if state law controls, which state law" to decide this case, it seems unlikely that state law would have a say in what a plan of reorganization must say or do to bind creditors—that seems a first-order question of federal law for bankruptcy courts to answer.  *See, e.g.*, *Spirit*, 668 B.R. at 717, *Container Store*, 2026 WL 395898, at *8–12.

The Seventh Circuit has, even in contexts that aren't directly on point, been sensitive to the reality that a confirmed plan is akin to, but not the same thing as, a typical contract.  *See Siemens Energy & Automation Inc. v Good (In re Heartland Steel, Inc.)*, 389 F.3d 741, 745 (7th Cir. 2004) ("[A] plan is not simply a private contract subject only to rules of contract interpretation (though indeed it may be contract-like for some purposes).  It is an agreement whose every provision has been approved and therefore activated by court order.").  Unlike the formation of a typical commercial contract, bankruptcy is a *collective* process involving a debtor and all stakeholders (many of whom the debtor usually lacks contractual privity with).  Without the ability to bind both holdouts and those who ignore the process entirely despite notice, there is very little point to the exercise.  Judge Rosenthal's opinion in *Container Store* details the similarities between a Plan and a consent decree, a "hybrid creature that is part contract and part judicial decree" which can "sweep more broadly than can other forms of court-ordered relief." 2026 WL 395858, at *11–12 (quotation marks and alterations omitted).  The alignment she

48

describes is persuasive, but I see an even closer parallel between a confirmed plan of reorganization and the hornbook court-approved class action settlement.

Under Federal Rule of Civil Procedure 23, one or more members of a class may "sue or be sued as representative parties on behalf of all members" of that class.[25]  Class representatives assume fiduciary duties to act in the best interests of all class members, and they are advised by counsel approved by the court who have those same fiduciary obligations.[26]  Where class members have sufficiently common claims seeking damages and the class representatives (whose individual claims are sufficiently typical) negotiate a settlement, every member of the class is given an opportunity to "opt out"—typically by being sent a letter in the mail describing the settlement with instructions on how to "opt out."[27]  Those who do not "opt out" are bound by the settlement and their claims are released.[28]  And the Supreme Court has repeatedly confirmed this structure as permitted under the federal rules and consistent with the Constitution.[29]

The bankruptcy process is (like class action litigation) by nature and design collective, and it provides real, highly analogous protection to creditors with claims against a debtor.  In a

---

[25]   Fed. R. Civ. P. 23(a).  In bankruptcy, while Rule 23 applies in adversary proceedings, *see* Fed. R. Bankr. P. 7023, it applies to contested matters only when the bankruptcy court directs and gives notice to all parties and a reasonable time to comply with the rule's procedures, *see* Fed. R. Bankr. P. 9014(c).

[26]   *E.g.*, *Addison Automatics, Inc. v. Hartford Cas. Ins. Co.*, 731 F.3d 740, 742 (7th Cir. 2013) ("Addison owes continuing fiduciary obligations to the class it represents.") (citing cases on the fiduciary duties of class representatives to class members); *Creative Montessori Learning Ctrs. v. Ashford Gear LLC*, 662 F.3d 913, 917 (7th Cir. 2011) (discussing class counsel's fiduciary duties to class members).

[27]   *E.g.*, *Senegal v. JPMorgan Chase Bank, N.A.*, 939 F.3d 878, 880 (discussing opt-out process and the fact that "[m]embers are entitled to opt out of Rule 23(b)(3) classes and pursue their claims individually").

[28]   *E.g.*, *Hays v. Marion Cnty. Sheriff*, 2024 WL 4635060 (7th Cir. Oct. 31, 2024) ("Class members dissatisfied with the settlement agreement had two options.  They could 'opt out' of the settlement and pursue their own case . . . [or] 'object' to the fairness of the proposed settlement . . . .  If the court approved the settlement, then class members who did not 'validly and timely' opt out of the proposed settlement would 'release' the [defendant] from their claims.").

[29]   *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811–14 (1985) (notice and right to opt out is sufficient to infer that those who do receive notice and don't opt out consent); *Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367, 395 (1996) (concurrence noting that, under *Phillips Petroleum*, to bind absentees, the class action process must include "notice, an opportunity to be heard, a right to opt out, and adequate representation").

Chapter 11 case, a creditors' committee is appointed, and its members have fiduciary duties to act in the best interests of all unsecured creditors.[30] Advisors to the committee must be approved by the court and have the same fiduciary duties to creditors. Not only that, but in those cases where certain groups of stakeholders aren't sufficiently represented by the creditors' committee, the Bankruptcy Code permits them (or the UST) to seek and obtain separate committees (funded by the estate) to ensure they are specifically protected throughout the process.[31] Debtors must provide known creditors with actual notice of a claims bar date, and both the form of notice and deadline are negotiated with the committee and a DOJ-affiliated agency. In addition, the bankruptcy process is highly public, and a debtor cannot take any action outside the ordinary course of business without giving actual notice to stakeholders and getting formal court approval. And "[n]o reorganization plan can be confirmed without the bankruptcy court's approval, which ensures that claimants are treated fairly and that the nondebtor releases are necessary."[32] All told, the bankruptcy process provides at least as much (if not more) notice to potentially affected creditors as the class action process, and bankruptcy is at least as protective (in my view, more protective) of claimants' rights as the class action process. The Supreme Court found similar safeguards sufficient to bind injured parties to class action settlements forty years ago in *Shutts*, and I am not persuaded the answer should be any different in the bankruptcy context.[33]

The bottom line is that for the reasons described in the Seventh Circuit's caselaw, in *Spirit*, and in *Container Store*, I believe the "opt-out" framework can work to imply consent to

---

[30] 11 U.S.C. § 1102(a)(1); *Diocese of Syracuse*, 667 B.R. at 634 (well-settled that a committee is the fiduciary of entire class of creditors it represents).

[31] 11 U.S.C. § 1102(a)(2); *see, e.g.*, *In re The Budd Co.*, 512 B.R. 910, 915–16 (Bankr. N.D. Ill. 2014) (directing appointment of separate committee of asbestos claimants).

[32] *Container Store*, 2026 WL 395898 at *15 (citing *In re Bestwall LLC,* 606 B.R. 243, 251 (Bankr. W.D.N.C. 2019), *aff'd* 71 F.4th 168 (4th Cir. 2023)).

[33] *Id.* at *15 ("*Shutts*'s logic applies with full force in bankruptcy proceedings.") (quotation omitted).

an appropriately scoped third-party release by some creditors in some circumstances.  Provisions like the TPR are not appropriate in all cases and won't be appropriate in most Chapter 11 cases. But they are necessary in many complex Chapter 11 cases and, where they are narrow and safeguards are in place to imply consent, I am prepared to confirm plans that include them.

E.

The Debtors have made sure everyone is on notice of what is happening.  And the Debtors have modified their Plan to remove the most challenging categories of proposed "Releasing Parties" from the definition.  So the question presented is whether it is fair to find consent to the release to the following categories of "Releasing Parties":

| Releasing Party[34] | Indicia of Consent | Receiving in Plan |
| --- | --- | --- |
| Debtors | Plan proponent, signed PSA | Release, discharge |
| Reorganized Debtors | Plan proponent, signed PSA | Fresh start |
| Master Trustee | Plan proponent, signed PSA, voted yes | New bonds, releases |
| Bond Trustee | Plan proponent, signed PSA, voted yes | New bonds, releases |
| ONB | Plan proponent, signed PSA, voted yes | New bonds, releases |
| MIF | Plan proponent, signed PSA, voted yes | New debt, material recovery on satisfied debt, releases |
| The Committee | Plan proponent | Material recovery, releases |
| Committee Members | Plan proponent | Material recovery, releases |
| Supporting Holders | Plan proponent, signed PSA, voted yes | New bonds, material recovery, releases |
| Vote to Accept | Voted yes | Varies |
| Deemed to Accept, and Don't Opt Out | Paid in full, received complete notice, neither objected nor opted out | Payment in full |

---

[34]   I am not troubled by the addition of "Related Party" to each "Releasing Party" because, by definition, the release would only bind such party to the extent the Releasing Party "is legally entitled to bind such Related Party to the releases contained in the Plan."  Plan, Art. I.A.1.146, clause (xiv).  That structure (which effectively kicks the can down the road to a time, if ever, when the question is germane) is a sensible way to combine the need for finality—the core purpose of the TPR—with the practical reality that trying to determine whether every single related party to a Releasing Party should be bound to a release right now would be hugely cumbersome.

The first type of creditor the Debtors seek to bind to the TPR is the one voting "yes" on the Plan. The Plan is clear—if you vote yes you are bound to the whole plan, including the TPR. *See* Plan Art. I.A.1.146; Disclosure Statement § 3.13. As the ballot form advised all voters, "opt outs" from creditors that vote yes are discarded as null and void. *See, e.g.*, General Ballot, Instruction 4 ("If you voted to accept the Plan in Item 2 above, (i) you will be deemed to consent to the releases contained in Article VIII.F of the Plan to the fullest extent permitted by applicable law and (ii) if you checked the box in Item 3, your election not to grant the releases will not be counted."). This is typical. And it should be non-controversial. Plans are multifaceted and their provisions are interrelated; a "yes" vote cannot come with a line-item veto.

The UST objects even to the basic principle that a "yes" vote on the plan is a sufficient manifestation of consent to the TPR (*see* UST Obj. ¶¶ 42, 55), but his argument is foreclosed by precedent and unreasonable on its face. *Specialty Equipment* approved a plan that bound a creditor to a third-party release because it had voted yes on the plan, and the release there operated to bar a real claim against third parties that creditors owned pre-petition and wanted to assert post-confirmation. 3 F.3d at 1047, 1049. I am bound by that result and agree with it in any event. Stakeholders are voting on *the plan as a whole* and there is no reason not to imply consent to each term of that plan (including releases) when they affirmatively vote "yes."[35]

---

[35] *See also Lavie Care Ctrs.*, 2024 WL 4988600, at *14 ("When the Plan and the ballot say explicitly that if you vote for the Plan, you are giving the Release, if you vote for the Plan, you have consented to the Release. That conclusion is supported by many cases, including *Specialty Equipment*, *supra*, 3 F.3d 1043, the only case on consensual releases cited by the majority in *Purdue*."); *Conseco*, 301 B.R. at 527 ("In *Specialty Equipment*, the 7th Circuit held that consensual releases of non-debtors are permissible, and that creditors who vote to accept a plan containing releases of non-debtors have consented to the releases."); *In re Keck, Mahin & Cate*, 241 B.R. 583, 592 (Bankr. N.D. Ill. 1999) ("[I]n accordance with *Specialty Equipment*, creditors who affirmatively accept a plan are bound by its releases and injunctions."); *Spirit*, 668 B.R. at 709 n.22 ("There is ample authority for the proposition that voting in favor of a plan that contains a third-party release provision constitutes consent to the release.") (citing cases); *Container Store*, 2026 WL 395868, at *19 ("[T]he Trustee argues that those who voted for the Plan but failed to opt out did not consent. This argument has been rejected, even by courts who otherwise have rejected opt outs to nondebtor releases."); *Smallhold*, 665 B.R. at 717 (while rejecting the "opt-

I take particular comfort in finding consent to the TPR from a "yes" vote to the Plan given the facts of this case. As my summary of proceedings above demonstrates, all of the sorts of issues to which the TPR could realistically relate were aired publicly by active stakeholders in this case and are unlikely to have escaped anyone's attention unless they were really paying no attention despite notice (which would be their own fault).[36] This Plan, in turn, reflects a series of settlements between the Debtors, their secured lenders, and the Committee (which, again, has fiduciary duties to all unsecured creditors), and the Plan is achievable—and the recoveries to otherwise-underwater creditors achievable—*only* through this structure, without which the secured lenders, who are making most of the sacrifices required by this reorganization, would not have signed on. The TPR are a critical part of the deal for an understandable reason:  the lenders are agreeing to (among other things) defer all principal payments for four years to help the Debtors get back on their feet and give the Debtors a 29-year amortization schedule on principal payments, but they are only willing to do that if the Debtors are truly getting a fresh start, and if they can put this difficult chapter with the Debtors behind themselves too to the greatest extent.[37] Unsecured creditors who would otherwise be receiving nothing are receiving material recoveries created by this plan structure, and their fiduciaries were directly involved in the bankruptcy— they spent millions of dollars investigating and advocating on creditors' behalf and obtained $1.4 million for payments of unsecured claims that otherwise were entitled to no recovery.

---

out" framework, finding that "creditors who voted on the plan (whether they voted for or against), however, have taken a sufficient affirmative step to be deemed to consent to the third-party releases").

[36]  I observed during the course of this case that many Residents attended each court hearing (remotely) to track its course. In addition, Ms. Bentley testified credibly that she has personal and daily contact with Residents at the facilities and that they are paying close attention to the case. (2/25 Hr'g Tr. at 87–89) Counsel for the Committee, in turn, advised me that they had specific sessions with creditors describing the process for "opting out" of the TPR. (*Id.* at 136)

[37]  2/25 Hr'g Tr. at 136–39.

All creditors with the right to vote voted "yes" after receiving full and complete, conspicuous, notice of the TPR in the Plan, Disclosure Statement, ballot, and hearing notice—notice that the UST concedes is sufficient to satisfy Bankruptcy Rule 2002(c)(3). Those who voted "yes" expressly consented to the TPR, but there would be plenty of reason to imply consent from these circumstances even if they had not. *See Gupta*, 934 F.3d at 714; *Pence*, 905 F.2d at 1109.

The second type of voter the Debtors originally sought to bind to the TPR is the one who voted "no" but failed to "opt out" of the third-party release. Courts have generally found that this type of creditor has manifested consent to a release;[38] they clearly read the Plan enough to vote on it and therefore should have realized that, per its terms, they needed to check the "opt-out" box separately from just voting "no" if they wanted to opt out. But this is an issue on which reasonable people can disagree, and I need not rule on whether this type of creditor can legally be bound to a TPR here because there are no such creditors: only one creditor voted "no" on the Plan and it also opted-out. That's exactly what creditors were directed to do if they wanted to opt out, and is another indication that the terms of the Plan were clear and that those who read the plan understood what they had to do if they declined to grant the TPR.

The third type of creditor that the Debtors seek to bind to the TPR is the one who wasn't allowed to vote because it is being paid in full through the Plan and thus is "deemed" to consent to the TPR unless it filled out an Opt-Out Form and timely returns it to the Debtor's agent. The question of creditors without the right to vote being bound to a release unless they opt out is one courts have "struggled" with and "reached a variety of conclusions." *Spirit*, 668 B.R. at 709. I, too, struggle with this question a bit even though I agree with Judge Rosenthal's conclusion that

---

[38] *E.g.*, *Container Store*, 2026 WL 395858, at *19; *Spirit*, 668 B.R. at 719–20; *Smallhold*, 665 B.R. at 717.

54

"[t]here is no Code inconsistency in modifying the relationship between claimants and nondebtors when claimants consent or their claims are fully satisfied." *Container Store*, 2026 WL 395898, at *11 (citing *CJ Holding*, 597 B.R. at 607–08; *Energy Res.*, 495 U.S. at 549–551; *Spirit*, 668 B.R. at 700–03; *Purdue*, 603 U.S. at 226). Judge Rosenthal's rationale was that "[t]he better reading of *Energy Resources*—in line with the fairer reading of *Purdue*—is that nondebtor releases are appropriate under § 112[3](b)(6) when, for example, the plan will 'in all likelihood,' 'provide[ ] for the full satisfaction of claims against [the] third-party nondebtor.'" *Container Store*, 2026 WL 395898, at *10 (internal citations to *Purdue* omitted). That's true enough, but I think the first order question is whether it is reasonable to infer consent to the TPR from the circumstances with respect to creditors who, in this specific case, are getting paid 100% and deemed to accept the plan in its entirety.

I think the answer here is "yes" for a variety of reasons. Those creditors "deemed to accept" are those in Classes 1, 4, 7B, and 9 (no creditor in Class 6 has been identified). Each will be paid in full through the plan and each has clear economic incentives to ensure their claims are accounted for and that payment through the plan's mechanics actually happens. Indeed, the only holder in Class 4 is MIF, a plan sponsor. Moreover, as described above, the Debtors' issues—and those involving other persons or entities potentially covered by the TPR—were all actively aired in the case and described in the Disclosure Statement. The Committee was involved in investigating all of those issues and in recommending the Plan, and along the way it advised its members and held "town hall" meetings for the vast majority of potential claimants, including those in Class 9. The documentation in the Plan and Disclosure Statement concerning the TPR and opt out has been consistent in all versions of the plan and these provisions were actively discussed during two well-attended court hearings prior to solicitation.

55

Any form of "opt out" by a creditor was sufficient to opt out, and the Debtors made an internet portal available for submission of opt outs in addition to accepting them by mail. *See Spirit*, 668 B.R. at 709. Indeed, more than 10% of all responses received by the Debtors checked the box for "opt out," including 3 of the 4 voters for whom opting out would make the most sense (those with personal injury tort claims), suggesting that voters understood the need to opt out—although some didn't read the instructions carefully enough to understand the need to vote no. If any "deemed to accept" creditors wanted to preserve third party claims covered by the narrow TPR in this Plan, they had every reason to understand the need to do so. So I approve, under the facts here, the TPR as applied to "deemed to accept" creditors who did not opt out.

Given the narrowness of the TPR here, my thinking also aligns with Judge Rosenthal's "full satisfaction" analysis. Again, the TPR here applies only to claims against Released Parties to which the Debtors would be necessary parties per Fed. R. Civ. P. 19 (or its state equivalent). What this really means is that the Debtors are paying these claims in full and the stakeholders sacrificing to create the plan want to ensure there are no frolics or detours against parties related to those making the plan possible, unfairly increasing transaction costs and interfering with the Debtors' fresh start. This in my view is both entirely reasonable and the near-functionable-equivalent of what the Supreme Court approved in *Energy Resources* as an "appropriate" use of 11 U.S.C. § 1123(b)(6), despite the potential impact of this plan provision on third-party claims.

The final type of creditor that the Debtors originally sought to bind to the TPR is the one who wasn't allowed to vote because it is receiving nothing and is "deemed to reject" the Plan. Many courts have rejected the "opt-out" structure with respect to "deemed to reject" creditors, reasoning that they have no incentive to pay attention to the bankruptcy or the plan and would have no reason to want the bankruptcy to succeed or otherwise help the debtor's

56

reorganization.[39] Fortunately, here, I do not need to rule on whether the TPR can apply to such creditors because the only class deemed to reject is the class of intercompany claims reflected in Class 10. Most if not all claims held by Class 10 claimants would already be released by the Estate Releases, and the Debtors and Reorganized Debtors are specifically named as Releasing Parties in the TPR, so reference to those "deemed to reject" creditors is not necessary in this case; that class of creditors has been removed from the Plan's definition of "Releasing Parties."

The bottom line is that, for the reasons stated here, I believe that the TPR can be properly applied to, and bind, those creditors who voted "yes" on this Plan and those "deemed to accept" because they are being paid in full (plus their Related Parties).

*    *    *

One final note on this point. In his compelling opinion in *Smallhold*, Judge Goldblatt parses *Purdue*[40] and issues a challenge to those who believe the opt out permissible post-*Purdue*. Specifically, he poses a hypothetical where a debtor's plan requires creditors who abstain and don't opt out to make a $100 donation to the debtor's CEO's alma mater, and describes how anyone who equates silence with consent must distinguish this intentionally absurd scenario from the proposed third party opt-out release.[41] While graft for the hypothetical CEO is certainly not an "appropriate" provision and would never be approved for that reason alone, that's not what

---

[39]   *E.g.*, *Spirit*, 668 B.R. at 704 n.14; *Container Store*, 2026 395858, at *20.

[40]   Perhaps Judge Goldblatt is reading *Purdue*'s tea leaves correctly on the issue of silence as consent. Time will tell. But I'm bound to different circuit law and I don't think *Purdue* (which explicitly declines to "express a view on what qualifies as a consensual release," *see* 603 U.S. at 226) is sufficiently clear on the point to overcome the Seventh Circuit authority driving my analysis. *E.g.*, *FutureSource*, 312 F.3d at 285 ("[L]ack of objection (provided of course there is notice) counts as consent."); *Pence*, 905 F.2d at 1109 (creditor is "not entitled to stick its head in the sand and pretend it would not lose any rights by not participating in the proceedings"). Moreover, as far as I can tell, the proposed release in *Smallhold* was far broader than the one before me and any parallel to *Energy Resources* less direct; maybe his answer would be different when considering the narrow TPR at issue here.

[41]   *Smallhold*, 665 B.R. at 709–10, 721–22.

57

the hypothetical is getting at. I agree that there must be a limiting principle to "what can be in a plan" consistent with *Purdue*'s discussion about the scope of 11 U.S.C. § 1123(b)(6).

In my view, the limiting principle stems from my earlier comment: while the provisions at issue seem broad conceptually, in reality and practice they are narrow and tied directly to both the claims being resolved through this bankruptcy case and the core purposes of Chapter 11. Third party claims must relate directly to claims against a debtor to be addressed in a plan. But surely a plan could, consistent with *Purdue*, release a third party's asserted claim that, in substance, is an estate-owned derivative claim. And how much further do these TPR really go? Remember that these TPR doesn't apply to a claim asserted against a Released Party unless a Debtor would be a required party to the claim under Fed. R. Civ. P. 19 (or its state equivalent). (*See* Plan, Art. VIII.F) Rule 19 requires parties to be joined *only* if complete relief is *impossible* without them, or where their interests *must* in fairness be resolved within the same case to be protected. *CCP Golden/7470 LLC v. Breslin*, 161 F.4th 461, 468 (7th Cir. 2025). So these TPR seem the sort of provision providing third party protection where claims against debtors and such third parties are inextricably intertwined akin to *Energy Resources*, and it doesn't implicate *Purdue*'s concern about binding those *who specifically object to releasing an identified claim*. To the extent the TPR come close in some hypothetical scenario, the opt out should provide sufficient protection for anyone who believes it has claims outside the scope of the payment promised by the Debtors. It is hard to imagine a closer connection between the hypothetical claims covered by these particular TPR and those against the Debtors that are directly resolved through the Plan, and prohibiting all plan provisions that could impact such claims would, in my view, read Section 1123(b)(6) out of the Bankruptcy Code. I decline that invitation.

58

VII.

The UST next asserts that the Exculpation provision in Article VIII.D of the Plan is drafted too broadly.  He argues that I should follow the case law limiting this sort of provision to estate fiduciaries.  (UST Obj. ¶ 90 (citing cases))  But the UST does not explain *why* he believes the legal analyses and conclusions in the cases he cites are superior to the cases going the other way (which he doesn't cite) and taking a broader view of the appropriate bounds of plan exculpation.  While acknowledging that "the Seventh Circuit has not yet weighed in" (*id.*), the UST overstates the law when he suggests that the Plan's Exculpation "exceeds allowed parameters" (*id.* ¶ 94).  There is a split in the way courts view exculpations, and while the proposed Exculpation would not be permitted in certain jurisdictions, it would in others.  Given the lack of binding authority, I must determine which camp has the better read.

The UST urges me to follow the Fifth Circuit in *Highland I*, which held that "an exculpation provision provides a 'fresh start' to a non-debtor in violation of [11 U.S.C.] § 524(e)." *NexPoint Advisors, L.P. v. Highland Cap. Mgmt., L.P. (In re Highland Cap. Mgmt., L.P.)*, 48 F.4th 419, 436 (5th Cir. 2022) ("*Highland I*").  But I disagree with the premise that exculpation and discharge are the same thing.  The two concepts are distinct.  A discharge is the extinguishment of a legal duty to pay a debt or satisfy an obligation, "the release of a debtor from monetary obligations,"—a release of personal liability for debts.  *Discharge* and *discharge in bankruptcy*, Black's Law Dictionary (12th ed. 2024).  In contrast, an exculpation is a determination that a party has no personal liability for a particular action, a "clearing from all fault or responsibility," an "exoneration." *Exculpation*, Black's Law Dictionary (12th ed. 2024).

59

It's subtle, but the difference is clear:  a discharge says you had an obligation, but now you do not have to satisfy it.  An exculpation says you had no obligation in the first place.[42]

So when Section 524(e) says that the "discharge of the debtor does not affect the liability of any other entity on . . . such debt," 11 U.S.C. § 524(e) (emphasis added), it is simply clarifying that non-debtor guarantors, co-debtors, insurers, etc. are not absolved from any personal liability they otherwise have for the claims the debtor has been discharged from.  A non-debtor guarantor still needs to make a lender whole on its loan to a debtor, a non-debtor insurer still needs to meet its coverage obligations for a tort claim against the insured debtor, and so on.  This section does not comment on whether those non-debtors have an obligation in the first place.  And I note that 11 U.S.C. § 1125(e)—a statutory exculpation of parties who participate in the solicitation or execution of a plan that provides for securities—neither includes language suggesting that it is a carve-out of or deviation from Section 524(e) nor limits its scope to estate fiduciaries.[43]

As I stated at the confirmation hearing, I believe the most compelling analysis of exculpation comes out of New York.  In *Aegean* and *Voyager*, Judge Wiles provides rational guidance for exculpations, rooted in the Bankruptcy Code and the practical reality facing parties

---

[42]   At least one of the cases cited by the UST agrees with this distinction.  *See Patterson v. Mahwah Bergen Retail Grp., Inc.*, 636 B.R. 641, 700 (E.D. Va. 2022) ("Exculpation provisions do not release parties, but instead raise the liability standard of fiduciaries for their conduct during their case."); *id.* at 701 ("Exculpation provisions, on the other hand, serve to ensure that court-supervised parties can carry out transactions to effectuate the plan without fear of liability for court-authorized actions.").  In other words, an exculpation is *neither* a release nor a discharge; it is a *finding* that the parties participating in this bankruptcy case did nothing wrong and that, if they implement the plan I am confirming here, they won't be doing anything wrong either, unless they commit fraud, gross negligence, or willful misconduct.  Neither *Purdue* nor Section 524(e) prohibits such a finding.

[43]   *Compare* 11 U.S.C. § 1125(e) *with* 11 U.S.C. § 1125(f) (using the phrase "[n]otwithstanding subsection (b)" to acknowledge that it is providing parameters for disclosure in a Subchapter V case that are different from those applicable to all other types of cases); 11 U.S.C. § 522(b)(1) (using the phrase "[n]otwithstanding section 541" to acknowledge that the exemptions allowances in that provision alter the general definition of what constitutes property of the estate); 11 U.S.C. § 365(a) (using the phrase "[e]xcept as provided in sections 765 and 766 . . ." to acknowledge specified limits or deviations on a trustee's general ability to assume or reject executory contracts and unexpired leases).  Had Congress meant section 524 to bar exculpations generally, it would have acknowledged that general bar when it imposed a statutory exculpation elsewhere in the title.

60

seeking to create order from chaos in complex, heavily-litigated Chapter 11 cases.  *See In re Aegean Marine Pet. Network Inc.*, 599 B.R. 717 (Bankr. S.D.N.Y. 2019); *In re Voyager Digital Holdings, Inc.*, 649 B.R. 111 (Bankr. S.D.N.Y. 2023).  His opinions look at what exculpation actually does and the critical role it serves in the functioning of the bankruptcy process:

> [A] proper exculpation provision is a protection not only of court-supervised fiduciaries, but also of court-supervised and court-approved transactions.  If this Court has approved a transaction as being in the best interests of the estate and has authorized the transaction to proceed, then the parties to those transactions should be not be subject to claims that effectively seek to undermine or second-guess this Court's determinations.  In the absence of gross negligence or intentional wrongdoing, parties should not be liable for doing things that the Court authorized them to do and that the Court decided were reasonable things to do.

*Aegean*, 599 B.R. at 721; *see also Voyager*, 649 B.R. at 133 ("[P]arties should not be liable for doing things that the Court authorizes them to do and that in many instances a court may direct them to do.").

This rationale makes eminent sense and in my view is exactly what Congress contemplated when it passed Section 1125(e).[44]  Without this protection, frustrated parties could menace a restructuring's stewards with post-hoc litigation—an ordeal sufficient to deter anyone from agreeing to shepherd a company through Chapter 11 (or at least cause them to charge far more than the current going rates to compensate for the trouble).  *See Azul S.A.*, 2026 WL 40912, at *6 (exculpations "play an important role in the bankruptcy process"); *In re Alpha Nat. Res.,*

---

[44]  Again, the statute on which exculpation is based itself is not limited to "fiduciaries," but instead applies to anyone who "participates" in good faith, consistent with the bankruptcy code, in an "offer, issuance, sale, or purchase" of a security related to the plan or the debtor.  11 U.S.C. § 1125(e).  *Highland I* seems to ignore this, and its rationale cannot be reconciled with approving exculpations for fiduciaries not employed by the debtor, which the Fifth Circuit sanctioned, *Highland I*, 48 F.4th at 437, and the UST agrees is appropriate.  And for similar reasons, I am not persuaded by the other cases cited by the UST.  For example, the court in *Patterson v. Mahwah* said that exculpations are appropriate to serve "only those aims of protecting parties who have performed necessary duties in connection with the case."  636 B.R. at 701.  I agree, but I don't agree that protecting only fiduciaries would satisfy those aims.  Neither the UST nor any case I've seen has compellingly articulated why that would be.  *See Washington Mut.*, 442 B.R. at 350–51 (stating that exculpation "must be limited to the fiduciaries who have served during the Chapter 11 proceeding" without articulating *why* that limitation "must" be so).

*Inc.*, 556 B.R. 249, 260–61 (Bankr. E.D. Va. 2016) ("As a policy matter, exculpations are necessary to ensure that capable, skilled individuals are willing to assist in the reorganization efforts in chapter 11 cases. . . [] and assure[ ] them they will not be second-guessed and hounded by meritless claims following the conclusion of the bankruptcy case."); *In re Chemtura Corp.*, 439 B.R. 561, 610 (Bankr. S.D.N.Y. 2010) ("[E]xculpation provisions are included so frequently in chapter 11 plans because stakeholders all too often blame others for failures to get the recoveries they desire; seek vengeance against other parties; or simply wish to second guess the decision makers in the chapter 11 case.").

For Chapter 11s to succeed, debtors need major constituencies to come to the table and actively participate in and support the restructuring efforts.  Those constituencies are most often corporate entities that act through their officers, directors, and employees.  Any incentive these parties have to help maximize value for stakeholders (for example, by providing financing, consenting to the use of cash collateral, or agreeing to "gift" a recovery to out of the money junior creditors in a plan to obtain consensus) is diminished if that help is an invitation to litigation from hold-outs.  (The proverbial saying is that "no good deed goes unpunished.")  Stakeholders participate when they believe their efforts will ensure they get more than they are statutorily entitled to in a liquidation; if the incremental value received through good faith participation in the process is eroded by litigation collaterally attacking those very efforts, no rational party would show up to participate voluntarily in a restructuring (let alone underwrite one), multiple constituencies would lose out, and ultimately the process would suffer.

As Judge Wiles observed in both *Aegean* and *Voyager*, denying good faith participants in the process the protection of exculpation would lead to the unfair second-guessing of decisions and acts that bankruptcy courts have either expressly or impliedly permitted stakeholders to take.

62

Remember that in bankruptcy, debtors must ask the court for permission for any act outside the ordinary course, and throughout a bankruptcy, parties in interest have myriad opportunities to object to conduct or raise concerns about activities undertaken in furtherance of the restructuring. *See Voyager*, 649 B.R. at 134–35 (noting that 11 U.S.C. § 1142(a) requires entities to comply with court directions and calling out the absurdity of compelling entities, their employees and advisors to carry out transactions contemplated by the plan while reserving parties' rights to subsequently challenge those transactions as illegal). The "strong presumption in favor of public access to bankruptcy proceedings and records," *In re Alterra Healthcare Corp.*, 353 B.R. 66, 73 (Bankr. D. Del. 2006), means that everyone has an unusually transparent view into the administration of a bankruptcy case. "Bankruptcy practitioners and judges sometimes call bankruptcy a fishbowl . . . for good reason," *In re Highland Cap. Mgmt. L.P.*, No. 19-34054, 2023 WL 5523949, at *26 (Bankr. N.D. Tex. Aug. 25, 2023), and parties can and should identify objectionable conduct as it happens—not in hindsight. That's why the law is "clear that there is a broader immunity for actions that are specifically approved by a court and/or that have been explicitly required to be taken by court order, particularly where government officials or other parties had the opportunity to object to the court's approval of an action and did not do so." *Voyager*, 649 B.R. at 135 (citing cases). A properly tailored exculpation provision implements this reality and, for that reason, is the very type of "appropriate provision" permitted by Sections 1123(b)(6), 1125(e), and 105(a) of the Bankruptcy Code—even after *Purdue*.

Here, the Exculpated Acts include only postpetition acts or omissions related to the Chapter 11 filing, the administration of the cases, the Plan, and the restructuring, and even those acts are not protected if they constitute or resulted from gross negligence or willful misconduct (including fraud). In other words, the Exculpation applies only to activities that took place in

63

good faith under my purview.  The time and place to challenge those activities was here and now, not in some far-flung location years from now.  Absent some extraordinary conduct coming to light, parties cannot, post-emergence (for example), sue the Master Trustee for requiring LLC to accept a 9% cap on management fees to obtain the bondholders' consent to the use of their cash collateral, harass MIF for negotiating a particular term in the new credit documents, or sue the Committee for not getting a better deal for Tort Claimants.  That's as it should be, given the Debtors' entitlement to a fresh start and the finality of the court orders entered throughout this case.  And since the only acts covered are those directly related to the restructuring activities I have approved, I am not concerned that the Exculpation does not cut off for conduct after the Effective Date.  One or more of the actions necessary to implement the Plan, for example, might well trail past the Effective Date.  The timing makes it no less conduct that was directed (impliedly or expressly) by the restructuring and/or one or more of my court orders.

The definition of Exculpated Parties is sufficiently narrow when viewed in the context of the limited conduct covered.  The UST doesn't identify a specific party it believes should be excluded from Exculpation, instead referring vaguely to non-fiduciaries and "unnamed entities." (UST Obj. ¶ 91)  That creates challenges in evaluating his Objection, but I assume the UST is referring to the inclusion of the funded-debt related parties in clauses (iii)-(vi) of the Exculpation and the categories of related parties listed in clause (viii) of the definition of Exculpated Parties. (Plan, Art. I.A.1.72)  No party disputes that the debt-related parties (all Plan proponents) have made material contributions to the Debtors' restructuring, including consenting to the use of their Cash Collateral and serving as co-architects of the restructuring (including negotiating, preparing, and executing all the various documents necessary to implement the Plan), which materially compromises their claims.  (*See also*, 2/25 Hr'g Tr. 78–79, 92; DX 6 § 6.11)  Nor does

64

anyone dispute that these parties' inclusion (along with their officers, directors, etc.—*i.e.*, the parties who physically undertook or internally approved these tasks) in the Exculpation was a bargained-for term in exchange for their support and facilitation of the Plan. (DX 4 § 8.*l*; *id.* at Ex. 1 p. 15 (Plan Term Sheet); 2/25 Hr'g Tr. 83–84, 92; DX 6 § 3.13)  These transactions, all of which I have approved (or am approving now), are the foundation of the restructuring; without these parties' contributions the Debtors would not be able to reorganize on favorable terms for all stakeholders.  (*See, e.g.*, 2/25 Hr'g Tr. 75 (Ms. Bentley testified that the marketing process did not yield any offers that would have satisfied the bond debt))

While the parties covered in clause (viii) of the Exculpated Parties definition aren't listed by name, they are easily discernible and comprise a limited group:  Only parties who served as an officer, director, employee, or advisor of a named entity during the bankruptcy *and undertook an Exculpated Act* benefit from Exculpation.  So this provision doesn't give unknown agents cutting secret deals in smoke-filled rooms "get out of jail free" cards; it protects the specific (though, yes, many) individuals it took to develop and negotiate the case, draft the pleadings and documents, implement the relief approved, and so on, such that all creditors can reap the benefits of this unanimous Plan.  If a party made this kind of contribution to the restructuring, I am not going to exclude them from the Exculpation clause absent a compelling reason to do so.  None has been offered here.  The UST's objection to the Exculpation, as amended,[45] is overruled.

VIII.

Finally, turning to Article VIII.C of the Plan, the UST objects to both the injunction implementing the plan's discharge, release, and exculpation provisions and the so-called

---

[45]   The UST also objected to the original Exculpation that entitled covered parties to rely on the advice of counsel. But the Debtors' addition of "to the extent permitted by applicable law" alleviates any concern that the provision "not serve as an absolute bar against liability."  *Azul S.A.*, 2026 WL 40912, at *8.

65

"gatekeeping" provision which requires parties to seek leave of court before filing lawsuits seeking to circumvent the Plan.  (UST Obj. ¶¶ 78–86).  I am not persuaded by these objections.

The UST first contends that *Purdue* prohibits the proposed injunction.  Not so.  Again, while ambiguous on some points, *Purdue* is clear on this: "[c]onfining ourselves to the question presented, we hold only that the bankruptcy code does not authorize a release and injunction that, as part of a plan of reorganization under Chapter 11, effectively seeks to discharge claims against a nondebtor without the consent of affected claimants." 603 U.S. at 227.  As discussed at length above, I believe the narrow TPR in this Plan, affecting the narrowed set of Releasing Parties following the concessions in the Debtors' Memorandum and at the hearing, is consensual.  The injunction provision itself does nothing more than implement the Plan; it doesn't turn something consensual into something coercive.  *See In re Container Store Grp., Inc.*, No. 24-90627, 2025 WL 4226766, at *8 (Bankr. S.D. Tex. Apr. 7, 2025).

28 U.S.C. § 1334(b) gives me jurisdiction over proceedings "related to" this bankruptcy. Citing it and bankruptcy courts' general authority under 11 U.S.C. § 105(a) to "issue any order, process, or judgment that is necessary or appropriate to carry out" the Bankruptcy Code, the Supreme Court has confirmed my jurisdiction over "suits between third parties which have an effect on the bankruptcy estate." *Celotex Corp. v. Edwards*, 514 U.S. 300, 307 n.5 (1995).  The Seventh Circuit has agreed, finding a near-identical argument to the UST's here "a misreading of the statute and our cases." *Caesars Ent. Operating Co. v. BOKF, N.A. (In re Caesars Ent. Operating Co.)*, 808 F.3d 1186, 1191 (7th Cir. 2015).  If I have authority to enter a consensual release (for the reasons stated above, I believe I do), enjoining acts barred by that Plan provision is part and parcel of that same power.

Here, the testimony at the confirmation hearing established, and I find, that the Estate Releases, TPR, and Exculpation were and are necessary and essential to the compromises effectuated through the Plan.  (*E.g.*, 2/25 Hr'g Tr. at 83–84)  The injunction is part of the deal; it is necessary and appropriate to implement, preserve, and enforce the discharge, as well as the releases and exculpations in the Plan, and is narrowly tailored to achieve this purpose.  Given my finding that these Plan provisions are integral to the bankruptcy case, the Supreme Court's decision in *Celotex* is precedent enough to reject the UST's objection.

The UST separately objects to language in the injunction that would require leave of court before certain plan participants can be sued for acts related to this bankruptcy—the so-called "Gatekeeping Provision."  (UST Obj. ¶¶ 82–86).  The Plan provides in relevant part:

> **WITH RESPECT TO CLAIMS OR CAUSES OF ACTION THAT HAVE NOT BEEN RELEASED, DISCHARGED, OR ARE NOT SUBJECT TO EXCULPATION, NO PERSON OR ENTITY MAY COMMENCE OR PURSUE A CLAIM OR CAUSE OF ACTION OF ANY KIND AGAINST THE DEBTORS, THE REORGANIZED DEBTORS, ANY EXCULPATED PARTY, OR ANY RELEASED PARTY THAT RELATES TO ANY ACT OR OMISSION OCCURRING FROM THE PETITION DATE TO THE EFFECTIVE DATE IN CONNECTION WITH, RELATING TO, OR ARISING OUT OF, IN WHOLE OR IN PART, THE CHAPTER 11 CASES (INCLUDING THE FILING AND ADMINISTRATION THEREOF), THE DEBTORS, THE GOVERNANCE, MANAGEMENT, TRANSACTIONS, OWNERSHIP, OR OPERATION OF THE DEBTORS, THE PURCHASE, SALE, EXCHANGE, ISSUANCE, TERMINATION, REPAYMENT, EXTENSION, AMENDMENT, OR RESCISSION OF ANY DEBT INSTRUMENT OR SECURITY OF THE DEBTORS OR THE REORGANIZED DEBTORS, THE PSA, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL OR OTHER ARRANGEMENTS OR OTHER INTERACTIONS BETWEEN ANY RELEASING PARTY AND ANY RELEASED PARTY OR EXCULPATED PARTY, THE RESTRUCTURING OF ANY CLAIM OR INTEREST BEFORE OR DURING THE CHAPTER 11 CASES, ANY OTHER IN- OR OUT-OF-COURT RESTRUCTURING EFFORTS OF THE DEBTORS; ANY INTERCOMPANY TRANSACTIONS, THE PSA, THE FORMULATION, PREPARATION, DISSEMINATION, NEGOTIATION, OR FILING OF**

**THE PSA AND THE DEFINITIVE DOCUMENTS (INCLUDING THE 2026 BOND DOCUMENTS), OR ANY OTHER CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH THE DISCLOSURE STATEMENT, THIS PLAN, OR ANY OF THE OTHER DEFINITIVE DOCUMENTS, THE PURSUIT OF CONFIRMATION, THE ADMINISTRATION AND IMPLEMENTATION OF THIS PLAN, INCLUDING THE ISSUANCE OF SECURITIES PURSUANT TO THIS PLAN, OR THE DISTRIBUTION OF PROPERTY UNDER THIS PLAN OR ANY OTHER RELATED AGREEMENT (INCLUDING, FOR THE AVOIDANCE OF DOUBT, PROVIDING ANY LEGAL OPINION REQUESTED BY ANY ENTITY REGARDING ANY TRANSACTION, CONTRACT, INSTRUMENT, DOCUMENT, OR OTHER AGREEMENT CONTEMPLATED BY THIS PLAN OR THE RELIANCE BY ANY EXCULPATED PARTY ON THIS PLAN OR THE CONFIRMATION ORDER IN LIEU OF SUCH LEGAL OPINION), WITHOUT THE BANKRUPTCY COURT (A) FIRST DETERMINING, AFTER NOTICE AND A HEARING, THAT SUCH CLAIM OR CAUSE OF ACTION REPRESENTS A COLORABLE CLAIM AND (B) SPECIFICALLY AUTHORIZING SUCH PERSON OR ENTITY TO BRING SUCH CLAIM OR CAUSE OF ACTION. TO THE EXTENT THE BANKRUPTCY COURT MAY HAVE JURISDICTION OVER SUCH COLORABLE CLAIM OR CAUSE OF ACTION, THE BANKRUPTCY COURT SHALL HAVE SOLE AND EXCLUSIVE JURISDICTION TO ADJUDICATE SUCH UNDERLYING CLAIM OR CAUSE OF ACTION SHOULD IT PERMIT SUCH CLAIM OR CAUSE OF ACTION TO PROCEED.** (Plan, Art. VIII.C)

Gatekeeping provisions began with the longstanding *Barton* doctrine, which requires a party to seek leave of the appointing court before initiating an action in another forum for acts done in a trustee's official capacity. *See Barton v. Barbour*, 104 U.S. 126 (1881); *In re Linton*, 136 F.3d 544, 545 (7th Cir. 1998) (extending *Barton* to bankruptcy trustees). Courts have extended *Barton* to other participants in Chapter 11 cases. *See, e.g.*, *Helmer v. Pogue*, No. 12-cv-1635, 2012 U.S. Dist. LEXIS 151262 (N.D. Ala. Oct. 22, 2012) (applying *Barton* to a debtor-in-possession); *Blixseth v. Brown (In re Yellowstone Mountain Club, LLC)*, 841 F.3d 1090, 1095 (9th Cir. 2016) (extending *Barton* to members of an unsecured creditors' committee); *Lawrence*

*v. Goldberg*, 573 F.3d 1265, 1270 (11th Cir. 2009) (applying *Barton* to the trustee's lawyers and creditors who "functioned as the equivalent of court appointed officers").

The Seventh Circuit has never directly addressed gatekeeping provisions, but recent decisions in other jurisdictions cast some doubt on whether bankruptcy courts can gatekeep non-parties seeking to initiate litigation in other venues.  In *Highland II*, the Fifth Circuit held that while bankruptcy courts have some power to act as gatekeepers to litigation where they would not have jurisdiction to adjudicate underlying claims and a case has concluded, it has "never extended the *Barton* doctrine to give bankruptcy courts gatekeeping power over claims against non-debtors." *Highland Capital Mgmt. Fund Advisors, L.P. v. Highland Capital Mgmt., L.P. (In re Highland Capital Mgmt., L.P.)*, 132 F.4th 353, 359 (5th Cir. 2025) ("*Highland II*").  It required the *Highland II* debtors to narrow their plan's gatekeeping provision to extend only to estate fiduciaries acting in their official capacity.  *Id* at 360.[46]  Judge Goldblatt has also rejected a similar provision, troubled by his reading of the proposed clause to require him to make a finding on the merits (and not just the released or non-released status) of the underlying claim.  *In re AIO US, Inc.*, -- B.R. --, 2025 WL 2426380, at *37–38 (Bankr. D. Del. Aug. 21, 2025).

While the UST doesn't cite these decisions,[47] his objection mirrors Judge Goldblatt's concerns.  The UST avers that the gatekeeping provision's application "to *any* "Person or Entity'" is problematic and that I lack the jurisdiction to perform the gatekeeping function that it contemplates.  (UST Obj. ¶¶ 84–85 (emphasis in original))  Applying Seventh Circuit precedent and reading the clause itself more narrowly than the UST's Objection fears, I disagree.

---

[46]   The Fifth Circuit conceded that "[o]ther circuits" have allowed gatekeeper provisions to apply to a "wider variety of court-appointed and court-approved fiduciaries and their agents," and it is yet unclear exactly how far their own definition of fiduciary will extend.  *Highland II*, 132 F.4th at 360 n.6.

[47]   One of the cases the UST relies on elsewhere in his Objection actually found a gatekeeping provision like this one to be *required*.  *See Patterson*, 636 B.R. at 702 (citing *Alpha Nat. Res.*, 556 B.R. at 260).

Just as the rest of the injunction serves as a procedural mechanism to enforce the releases, the gatekeeping provision is the process established by the Plan to enforce the injunction.  Again, Congress granted bankruptcy courts broad jurisdiction and authority over matters related to bankruptcy proceedings.  *See* 28 U.S.C. § 1334(b); *Energy Res.*, 495 U.S. at 549; *Celotex*, 514 U.S. at 307.  The question of whether a party is disobeying or engaging in a collateral attack on my orders is an issue squarely within my core jurisdiction.  *See, e.g.*, *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009) ("The Bankruptcy Court plainly had jurisdiction to interpret and enforce its own prior orders."); *Conseco, Inc. v Schwartz (In re Conseco, Inc.)*, 330 B.R. 673, 683 (Bankr. N.D. Ill. 2005) ("[W]hen the question involves a central bankruptcy right like the discharge, the court has core jurisdiction.").  There is little doubt that I have jurisdiction to determine whether a post-confirmation claim, wherever asserted, is barred by my prior orders, or whether a party is acting in contempt of them.  *See Kimball Hill,* 61 F.4th at 533 (finding "[t]he answer is clearly yes" that the bankruptcy court has jurisdiction to decide whether claims were barred by its prior order and thus if it is appropriate to enjoin a creditor from pursuing them). "This includes the authority to enforce the provisions of a confirmed plan." *In re Stamps*, 644 B.R. 760, 766 (Bankr. N.D. Ill. 2022).  Even if a party is incorrect when claiming that my Orders bar a post-confirmation claim, the Seventh Circuit has confirmed I have jurisdiction to make that determination.  *Kimball Hill*, 61 F.4th at 533 (in contending the "bankruptcy court lacked jurisdiction to interpret and enforce" a confirmation order, the creditor "conflates a jurisdictional question with a merits question").

It makes sense for me to interpret my own orders in the first instance; that's exactly the sort of function that the Seventh Circuit approved in *Kimball Hill.*  Consider the converse of what is proposed in the Plan, where there is no "Gatekeeper" provision and a party initiates an

70

action in state court that plainly runs afoul of the release provisions.  The Reorganized Debtors (and perhaps others) would inevitably file a motion to reopen this bankruptcy case and seek to enforce the releases and injunction in the Plan, and the parties would end up before me anyway (absent a quick fold by the plaintiff).  In practice, regardless of what is specified in the Plan, I am the best-equipped gatekeeper of whether post-confirmation claims run afoul of the Confirmation Order.  Funneling all questions of what is and is not barred through me ensures consistency of interpretation and application across the board.  And the only thing that really changes by specifying that would-be litigants must start with me is consequences—plaintiffs don't risk being sanctioned for violating the Confirmation Order if they first ask me for leave.  *See, e.g.*, *Kimball Hill*, 61 F. 4th at 531–33, 535 (affirming $9.5 million sanction for party's "clear contempt" of a confirmation order).  Plaintiffs will also likely get a quicker decision by coming to me first; the question of whether the suit is barred under the Plan will have to be answered as a threshold matter regardless of forum, and I am likely to resolve that far faster than a non-bankruptcy court unfamiliar with the releases and these cases.  So the Gatekeeper process is likely *better* for the affected parties—bringing the issue to me *first* will get the preliminary issue resolved quickly, and it will not risk sanctions because the plaintiff will be asking for permission, not forgiveness.

And that is all the work that the gatekeeping provision really does here.  To perhaps give the UST some comfort and to make this clear to the Debtors and other stakeholders, I do not read this provision to allow me to rule on the underlying merits of any claim unless the claim otherwise falls under the jurisdiction of the Bankruptcy Court.  The gatekeeper provision merely positions this court to streamline post-confirmation litigation by providing uniform interpretation of what claims are and are not colorable *in light of the Plan and its releases*.  So, to be clear, I am not going to apply the Federal Rule of Civil Procedure 12(b)(6) or 9(b) standards to dismiss

71

claims asserted post-confirmation, nor am I going to try my hand at Illinois's state law "fact pleading" requirements (or those of a less familiar state law regime).  Said another way, I am not going to determine whether a post-confirmation pled claim suffices under the underlying applicable substantive law.  All I read the "gatekeeper" provision to do is give me authority to make the call on whether a post-confirmation suit colorably circumvents this opinion, any of my prior orders, and/or the terms of the Plan and Confirmation Order.  *Travelers, Kimball-Hill*, and other authorities make clear that to be within my authority.  And like the other parts of the injunction, the gatekeeping provision is a core part of the bargain among the parties-in-interest, necessary to give full effect to the exculpation and release provisions.  For these reasons, I overrule the UST's objection to the injunction and gatekeeping provisions of the Plan.

IX.

I appreciate the UST's diligence in raising these issues, protecting the process, and forcing the Debtors to meet their burden of proof.  Meaningful changes have been made to the Plan as the result of his team's fine work; among other things, the UST's team convinced the Plan proponents that some difficult questions originally presented are best left for another day. But for the reasons stated in this opinion, the UST's remaining objections are overruled, the Disclosure Statement is approved, and the Plan will be confirmed.  I will enter a separate order confirming the Plan consistent with this opinion and will discuss an appropriate form of confirmation order with the parties on March 4, 2026, at 1:00 p.m.

Signed:   March 4, 2026          By:   _____

MICHAEL B. SLADE
UNITED STATES BANKRUPTCY JUDGE